SOWECO, INC., Plaintiff-Appellant,

v.

SHELL OIL COMPANY, etc. and Shell Chemical Company, etc., Defendants-Appellees.

No. 78–2590.

United States Court of Appeals, Fifth Circuit.

May 30, 1980.

---

2. 21 U.S.C. § 846 and § 841(b)(1)(A) (1976).

Samuel L. Boyd, Dallas, Tex., for plaintiff-appellant.

Arnold, White, & Durkee, Louis T. Pirkey, Houston, Tex., Gibson, Ochsner, & Adkins, S. Tom Morris, Amarillo, Tex., for defendants-appellees.

Before GEE, FAY and VANCE, Circuit Judges.

GEE, Circuit Judge:

Slugs, larvae, nematodes, and rodents form the supporting cast in this trademark drama; the protagonists are the terms "Larvacide" and "larvicide." Our etymological investigation of these entomological terms leads us to affirm in main the judgment of the careful trial court in this complex and demanding cause.

The trademark "Larvacide" was originally registered in 1927 by Innis, Speiden & Company ("ISC") to designate fumigants for exterminating bugs, insects, slugs, and rodents. It is used today on similar products. After the initial term of registration expired, ISC reregistered the mark in 1951. At that time the trademark examiner found that the mark had become "distinctive of applicant's goods"; in other words, the trademark had become "incontestable" within the meaning of the Lanham Act. See 15 U.S.C. § 1065 (1976).

After an intervening assignment,[1] Nor-Am Agricultural Products, Inc. ("Nor-Am") acquired all rights in the mark "Larvacide" in 1957. Like its predecessors, Nor-Am sold tear gas composed primarily of chloropicrin under the "Larvacide" label as a grain fumigant for the control of bugs, insects, and rodents in grain elevators and bins. However, on August 13, 1970, Nor-Am notified its distributors that its "Larvacide" line of products had been discontinued and that orders could no longer be accepted.[2] "Larvacide" products nevertheless remained for a time on distributors' shelves and continued to be sold. In its application for renewal of its "Larvacide" registration in April 1971, Nor-Am represented to the Patent and Trademark Office that "Larvacide" was "still in use in interstate commerce or in connection with fumigants intended for use as an exterminator of bugs, insects, slugs and rodents" and that the label submitted at that time "shows the mark as actually used on goods at the present time [April 5, 1971]."

In November 1973, Nor-Am assigned all of its rights in its "Larvacide" trademark to Southwestern Grain Supply Company ("Southwestern"), the predecessor in interest of plaintiff Soweco, Inc. ("Soweco").[3] Since that time Soweco has marketed grain fumigants, like those sold by Nor-Am, under the label "Larvacide."

1. In 1952 ISC transferred its rights in the mark to International Minerals & Chemicals, which in turn transferred the mark to Nor-Am.

2. Nor-Am sold no products under the "Larvacide" name after July 31, 1970.

3. Soweco was formed on April 24, 1977. Mr. Robert Bauman, who became president of the newly formed corporation, had acquired the assets of Southwestern in December 1973. These became Soweco's assets. According to his testimony, Mr. Bauman formed Soweco "to merchandize Larvacide throughout the United States."

In April 1975, Nor-Am executed a second assignment, this one to Soweco, Inc. d/b/a Southwestern Grain Supply Co. This assignment transferred Nor-Am's rights in the "Larvacide" trademark and any goodwill associated with it, its copyright privilege in certain labels and booklets, and its United States Department of Agriculture registration numbers in certain "Larvacide" products to Soweco.

Shell Chemical Company, a division of Shell Oil Company ("Shell"), manufactures two products alleged to infringe on Soweco's trademark: (1) SHELL Poultry Spray & Larvicide and (2) RABON ® Oral Larvicide. Originally developed and marketed as two separate products,[4] SHELL Poultry Spray & Larvicide was first marketed in 1974. A liquid ordinarily used in spray form, this product can either be sprayed directly on birds to control mites and lice or sprayed on poultry droppings to inhibit the growth of larvae and maggots. Shell sells SHELL Poultry Spray & Larvicide to a small number of distributors (ten to twelve) who resell it to poultry farmers. RABON ® Oral Larvicide is added to cattle feed to control fly larvae in manure. Developed in the late 1960's and first sold in 1972, RABON ® Oral Larvicide is chiefly sold to feed companies for incorporation into their own brands of cattle feed.[5]

In February 1976, Soweco brought suit against Shell, charging both trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1051 et seq. (1976), and unfair competition under state law. The district court granted plaintiff's motion to bifurcate the issues of liability and damages.[6]

Trial on the issue of liability was held in February 1978. After several days of testimony the district court submitted 25 special issues to the jury.[7] After a day of deliberations, the jury was unable to answer all of the questions unanimously. After receiving an *Allen*[8] charge, the jury returned a unanimous verdict on all issues the following

afternoon. At plaintiff's request, the judge polled the jury. Although several jurors initially indicated that the answers to one or more of the special issues did not reflect their individual judgments, they subsequently explained their actions and affirmed the unanimity of the jury's answers.[9]

Because the judge thought there was an "irreconcilable conflict between the jurors' answers" to some of the special issues, he granted plaintiff's motion for a mistrial and ordered a new trial. Subsequently, however, the court issued a memorandum opinion granting judgment for Shell on plaintiff's Lanham Act claims and ordered cancellation of plaintiff's trademark "Larvacide" on the ground that the jury had found the mark to be a common descriptive name.[10] 15 U.S.C. § 1064(c). With respect to the state law unfair competition claim, the judge granted a judgment n. o. v. for the defendant. Soweco appeals from the court's determinations.

*Trademark Infringement*

Trademark cases often involve line drawing in areas that are inherently "fuzzy." This problem is exacerbated in the instant case by the jury's contradictory answers to some inartfully worded special issues and the judge's subsequent attempts to reconcile those answers. For these reasons, it may be helpful to set out the basic principles of applicable trademark law[11] before turning to the jury's findings and the judge's conclusions.

---

4. SHELL Poultry Spray was first marketed in 1971 and SHELL Poultry Larvicide in 1972.

5. Approximately 80% of RABON® Oral Larvicide produced by Shell is sold to feed companies; the other 20% is sold to distributors who resell it to feedyards and dairies.

6. The court later refused plaintiff's request to reconsider the granting of that motion.

7. For clarity, the special issues and accompanying instructions that were submitted to the jury are reproduced with the jury's answers in an appendix to this opinion.

8. *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

9. *See* n.29 and accompanying text, *infra*.

10. *See* n.13 and accompanying text, *infra*.

11. For excellent discussions of basic principles, *see Vision Center v. Optics, Inc.*, 596 F.2d 111 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976); *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

Terms for which trademark protection is sought are customarily grouped into four categories:[12] (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. Although meant as pigeon-holes, these useful labels are instead central tones in a spectrum; they tend to merge at their edges and are frequently difficult to apply. *Vision Center v. Optics, Inc.,* 596 F.2d 111, 115 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).

A "generic"[13] term refers to "a particular genus or class of which an individual article or service is but a member," *id.; Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976); it suggests the "basic nature of articles or services." *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.,* 494 F.2d 3, 11 (5th Cir. 1974). A word may be generic of some things and not of others: "ivory" is generic of elephant tusks but arbitrary as applied to soap. *Abercrombie & Fitch,* 537 F.2d at 9 n.6. A generic term can *never* become a trademark. *Miller*

*Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 79 (7th Cir. 1977) (citing *William R. Warner & Co. v. Ely Lilly & Co.,* 265 U.S. 526, 528, 44 S.Ct. 615, 616, 68 L.Ed. 1161 (1924)), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch,* 537 F.2d at 9. Moreover, if a registered mark *at any time* becomes generic with respect to a particular article, the Lanham Act, 15 U.S.C. § 1064(c),[14] provides for the cancellation of that mark's registration. *See, e. g., Haughton Elevator Co. v. Seeberger,* 85 U.S.P.Q. 80 (1950) (the mark "Escalator" had become generic).

A "descriptive" term "identifies a characteristic or quality of an article or service," *Vision Center,* 596 F.2d at 115, as, for example, its color, odor, function, dimensions, or ingredients. *American Heritage,* 494 F.2d at 11. Although descriptive marks are not automatically protectable, 15 U.S.C. § 1052(e)(1),[15] they may be registered if they have acquired secondary meaning for the consuming public.[16] *See id.* § 1052(f).[17] Examples of descriptive marks

---

**12.** Any given term's correct categorization is a factual issue. *Salton, Inc. v. Cornwall Corp.,* 477 F.Supp. 975 (D.N.J.1979) (citing 3 Callman, *Unfair Competition, Trademarks & Monopolies* 40 (Supp.1978)).

**13.** The term "generic" is synonymous with the phrase "common descriptive name," as used in the Lanham Act. *See* 15 U.S.C. §§ 1064(c), 1065(4).

**14.** Section 1064(c) provides:

A verified petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed by any person who believes that he is or will be damaged by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905—

    \*     \*     \*     \*     \*     \*

(c) *at any time if the registered mark becomes the common descriptive name of an article or substance,* or has been abandoned, or its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsections (a), (b), or (c) of section 1052 of this title for a registration hereunder, or contrary to similar prohibitory provisions of said prior Acts for a registration thereunder, or if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent the source of

the goods or services in connection with which the mark is used; . . . .
(emphasis added).

**15.** Section 1052(e)(1) prohibits the registration of a mark that, "when applied to the goods of the applicant is merely descriptive . . . of them." The term "descriptive," as used in this opinion, signifies trademarks that are "merely descriptive" within the meaning of this subsection. It does not refer to generic or "common descriptive" names.

**16.** "The secondary meaning doctrine . . . holds that words which have a primary meaning of their own . . . may by long use in connection with a particular product, come to be known by the public as specifically designating that product." *Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 477 (5th Cir. 1974). In order to establish secondary meaning, the plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Vision Center,* 596 F.2d at 118 (citing *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938)).

**17.** Section 1052(f) provides:

(f) Except as expressly excluded in paragraphs (a)–(d) of this section, nothing in this

would be "Vision Center" in reference to a place where one purchases eyeglasses, *Vision Center, supra,* or "EVERREADY" with reference to batteries or light bulbs. *Union Carbide Corp. v. Every-Ready, Inc.,* 531 F.2d 366 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). As we noted in *Vision Center,* 596 F.2d at 115 n.11, "the distinction between descriptive and generic terms is necessarily one of degree."

■ A "suggestive" term "suggests, rather than describes," some characteristic of the goods to which it is applied and requires the consumer to exercise his imagination to reach a conclusion as to the nature of those goods. *Vision Center,* 596 F.2d at 115–16. If used as a trademark for refrigerators, the term "Penguin" would be suggestive. Suggestive terms require no proof of secondary meaning in order to be protected. *Id.* at 116.

■ "Arbitrary" or "fanciful" terms, such as "Kodak," bear no relationship to the product or service with which they are associated. Like suggestive terms, they may be registered without proof of secondary meaning.

■ Once a mark has been registered, proof of registration is prima facie evidence of the registrant's right to use the mark, but it does not preclude one who is sued for trademark infringement from proving "any legal or equitable defense or defect which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a). If, however, a registrant has used his mark in connection with the goods or services specified on his registration for five continuous years after the registration date, his mark is deemed "incontestable," *id.* 1065; [18] his registration constitutes "conclusive evidence" of his right to use the mark, subject only to the seven defenses enumerated in 15 U.S.C. § 1115(b).[19] An "incon-

---

chapter shall prevent the registration of a mark used by the applicant *which has become distinctive of the applicant's goods in commerce.* The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration. (emphasis added).

18. Section 1065 provides:
Except on a ground for which application to cancel may be filed at any time under subsections (c) and (e) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: *Provided,* That—
(1) there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the Patent Office or in a court and not finally disposed of; and
(3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and the other matters specified in subsections (1) and (2) of this section; and
(4) no incontestable right shall be acquired in a mark which is the common descriptive name of any article or substance, patented or otherwise.
Subject to the conditions above specified in this section, the incontestable right with reference to a mark registered under this chapter shall apply to a mark registered under the Act of March 3, 1881, or the Act of February 20, 1905, upon the filing of the required affidavit with the Commissioner within one year after the expiration of any period of five consecutive years after the date of publication of a mark under the provisions of subsection ('c) of section 1062 of this title.
The Commissioner shall notify any registrant who files the above-prescribed affidavit of the filing thereof.
(emphasis in original).

19. 15 U.S.C. § 1115(b) states:
(b) If the right to use the registered mark has become incontestable under section 1065 of

testable" mark cannot be challenged as lacking secondary meaning; such marks are conclusively presumed to be nondescriptive or to have acquired secondary meaning. *Union Carbide*, 531 F.2d at 377. This is perhaps the most significant benefit that being "incontestable"—a "suggestive" if not "arbitrary" term as applied to the status it describes—confers on a mark.[20]

■ Among the several permissible defenses to an "incontestable" mark is the "fair-use" defense, 15 U.S.C. § 1115(b)(4). *See* n.19, *supra*. That defense is available only when the allegedly infringing term is used not as a trademark but "fairly and in good faith only to describe to users the goods and services of [a] party, or their geographic origin." *Id. See Venetianaire Corp. v. A & P Import Co.*, 429 F.2d 1079,

1081–82 (5th Cir. 1970). The "fair-use" defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods.

■ Liability under the Lanham Act for trademark infringement is predicated on use of a registered trademark that "is likely to cause confusion." 15 U.S.C. § 1114(1)(a).[21] In this circuit likelihood of confusion is determined by evaluating a variety of factors, including the type of trademark at issue; similarity of design; similarity of product; identity of retail outlets and purchasers; identity of advertising media utilized; defendant's intent; and actual confusion. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258–259 (5th Cir.

this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defenses or defects is established:

   (1) That the registration or the incontestable right to use the mark was obtained fraudulently; or

   (2) That the mark has been abandoned by the registrant; or

   (3) That the registered mark is being used, by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services in connection with which the mark is used; or

   (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin; or

   (5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to registration of the mark under this chapter or publication of the registered mark under subsection (c) of section 1062 of this title: *Provided, however,* That this defense or defect shall apply only for the area in which such continuous prior use is proved; or

   (6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: *Provided, however,* That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or

   (7) That the mark has been or is being used to violate the antitrust laws of the United States.
(emphasis in original).

20. Of course, the benefit will be of value only to registrants whose trademarks are descriptive, since only descriptive marks require a showing of secondary meaning to be protectable. *See* nn.15–17 and accompanying test, *supra*. Trademarks that have become generic are subject to cancellation even if they have acquired secondary meaning. *See* p. 1183, *supra*.

21. That subsection provides:
   (1) Any person who shall, without the consent of the registrant—
      (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

1980) (citing *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975)). Proof of actual confusion is unnecessary; the *likelihood* of confusion is the determinative factor. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971). Actual confusion is, however, strong proof that the likelihood of confusion exists. Moreover, "while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *Id.* The likelihood of confusion is a question for the trier of fact. *Amstar*, 615 F.2d at 257–258; *Boston Pro Hockey Association v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 F.2d 1004, 1012 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

We now turn to the instant facts. The jury in Special Issue Eighteen found that "as of the present date [February 24, 1978] the word "larvicide" is the common descriptive name for an agent or substance for killing larvae." Defendant argues that this finding effectively disposes of plaintiff's trademark infringement claim: because the jury determined that larvicide had become [22] generic, plaintiff's mark was no longer entitled to trademark protection and was subject to cancellation under 15 U.S.C. § 1064(c). *See* n.13, *supra*. The district judge, in his memorandum order, relied on this rationale to grant judgment for the defendant on the trademark claim and cancel plaintiff's registration.

There are two significant problems, however, with this approach. First, in the instruction that accompanied Special Issue Eighteen, the judge defined a "common descriptive name" with a definition of a *descriptive* term rather than a generic term.[23] It is therefore arguable that the jury found only that "larvicide" is a *descriptive* mark since it assessed that word in terms of a descriptive definition. Second, the special issue did not require the jury to consider whether *plaintiff was using* the word "larvicide" in its generic sense.[24] As we have previously noted, "protection afforded trademarks by both the Lanham Act and the common law focuses on the *use* of words, not on their nature or meaning in the abstract." *Venetianaire*, 429 F.2d at 1082 (emphasis in original). *See also Abercrombie & Fitch*, 537 F.2d at 9. The instruction accompanying Special Issue Eighteen explicitly acknowledges that. *See* n.23, *supra*. Based on these problems with Special Issue Eighteen, plaintiff contends that the judge erred in finding for defendant on the trademark infringement claim and in cancelling plaintiff's mark.

Plaintiff's contention is in part well taken: for the reasons discussed above, a judgment for defendant cannot rest on the jury's finding in Special Issue Eighteen that "larvicide" is a generic term. We conclude, however, that defendant is entitled to prevail on the basis of a fair-use defense.[25] *See* p. 1185, *supra*. The fair-use defense requires that the allegedly infringing term be *"descriptive* of . . . the goods." 15 U.S.C. § 1115(b)(4) (emphasis added). There was ample evidence at trial that defendant's products, RABON® Oral Larvicide and SHELL Poultry Spray & Larvicide, were primarily, if not exclusively, used

---

**22.** The jury found that larvicide was not a generic term on August 21, 1951, the date of ISC's reregistration. *See* Appendix, Special Issue Seventeen.

**23.** *See* p. 1183, *supra*. The remainder of the instruction gave accurate examples of generic terms and properly explained that a generic term could serve as a trademark "if it is used for something *other than* that for which it is in fact the common descriptive name." (emphasis in original).

**24.** Plaintiff's using the phonetic equivalent of the generic term "larvicide" in its mark "Larva-

cide," *i. e.*, misspelling it, does not render the mark protectable. *Miller Brewing*, 561 F.2d at 79.

**25.** As a preliminary matter, we note that the parties stipulated that plaintiff's trademark "Larvacide" was "incontestable under Section 15 of the Trademark Act of 1946, as amended." We reject Shell's contention that it stipulated to the mark's incontestability for limited purposes only. If Shell had intended the stipulation to be restricted in any fashion, it should have inserted a proviso to that effect or declined to stipulate on this matter.

to kill fly larvae. Although Soweco's president, Robert Bauman, disputed the *effectiveness* of Shell's products in killing larvae, he had stated in his deposition, which was read to the jury, that RABON® Oral Larvicide "kills specifically larvae and nothing else." Walter Tramel, a chemist and private consultant who testified for plaintiff, stated on cross-examination that defendant's product names were "precisely descriptive"[26] and "entirely descriptive"[27] of defendant's products. Various defense witnesses also testified that Shell's use of the word "larvicide" in its product names was a descriptive or generic use of the term.[28] The evidence is thus overwhelming that Shell fairly used the word "larvicide" to describe its product.

To prevail on a fair-use defense, however, Shell must also show that it used the mark in good faith and that it did not use the term "as a trade or service mark." *Id.* The jury found in Special Issue Nineteen that Shell fairly and in good faith used the term only to describe the nature of its products and not as a trademark. Soweco attacks this finding on two grounds. First, Soweco contends that the verdict is not valid because it was not the decision of a unanimous jury. Second, plaintiff submits that the jury's answer to Special Issue Nineteen conflicts with its answers to Special Issues Eleven and Twelve. Neither of these contentions has merit.

■ Contrary to plaintiff's assertion, the jury verdict *was* unanimous. Although several jurors indicated that they had pressed for a different answer to certain special issues during the deliberations, when the jury was polled each juror affirmed the unanimity of the verdict.[29]

26. Q: So, that the term "Poultry Spray and Larvicide" is precisely descriptive of all of the components of that product, isn't it?
A: Yes, sir.
Q: It fairly describes—it is two aspects, both a spray killing aspect and its Larvicide residual aspect, doesn't it?
A: Descriptive, yes sir.

27. Q [with respect to RABON® Oral Larvicide]: All right, sir. And you would understand from that, then, that this is a product which is fed to cattle which kills larvae, would you not?
A: Yes, sir.
Q: All right, sir. And in that respect, it is entirely descriptive of the product, isn't it, Mr. Tramel?
A: Yes, sir.

28. Donald Ulrich, manager of Shell's Animal Health Business Center, testified that "larvicide" is a "descriptor" for Shell's product names, "just a way of describing it [the product] so that the farmer has a clear definition of its use." Furthermore, Jack Foltz, a Shell trademark attorney, and Steve Flynn, a senior business representative of Shell Chemical Co., both testified that Shell's use of the term "larvicide" was use of the term in its generic sense.

29. THE COURT: Now, ladies and gentlemen, nobody is trying to embarrass you or cause you any discomfort. So, please feel free to answer my questions. Mrs. Mall, which were the two questions that you had some question about when I polled you a moment ago?
MRS. MALL: The one about fair.

THE COURT: About unfair competition, is that what you are talking about? Is that what you—what number? Do you have that handy? Number 19, let me read that to be sure we are—19 reads as follows, "Do you find from a preponderance of the evidence that Shell has used the word 'larvacide' otherwise than as a trademark fairly and in good faith only to describe to users the nature of its product." The answer as I read it was, "Shell has fairly and in good faith used the word 'larvicide' only to describe the nature of its product." Now, as I understand you voted that way?
MRS. MALL: Yes.
THE COURT: But you said that doesn't really represent your individual judgment, is that—I don't mean to put words in your mouth.
MRS. MALL: I know, but I voted that way, I will stick to that.
THE COURT: Well, do you wish to change your vote in any way?
MRS. MALL: No.
THE COURT: Do you feel like that after considering all of the evidence and considering fairly the arguments and positions of your other jurors that you wish your vote to stand that way?
MRS. MALL: Yes.
THE COURT: Did you vote that way only because the majority was voting that way?
MRS. MALL: I really don't know why I did.
THE COURT: Well—
MRS. MALL: Come to that conclusion, but—
THE COURT: Would it be—again, I don't want to put words in your mouth, but I guess I am reading between the lines here, but are you telling me that on your original vote, that you voted opposite to what I read?

MRS. MALL: Yes.

THE COURT: In other words, has not fairly, but then it turned out, how was the jury divided on that, do you remember on the first few votes, was it six to six?

MRS. MALL: It was divided quite a bit to start with.

THE COURT: By a substantial division?

MRS. MALL: Yes.

THE COURT: And then finally took additional votes, and additional votes, and were you the last one to come around?

MRS. MALL: One of the last ones.

THE COURT: One of the last ones? And did you come around solely because of all the others were voting that way or did you finally decide that in your judgment and in your view of the evidence you wanted to vote that way?

MRS. MALL: I guess that is the reason.

THE COURT: Now, which way was it? I will let you answer it, I don't want to answer it for you.

MRS. MALL: Well, I am sure that would have to be the reason I did.

THE COURT: What was the reason?

MRS. MALL: That I decided that that was the way I should vote on account of the evidence.

THE COURT: All right. Now, there was another issue. Do you remember what the— there were two I believe you told me.

MRS. MALL: Yes.

THE COURT: Do you remember what the other one was about? Can anybody help us out here?

JUROR: No. 16.

THE COURT: No. 16. All right. Let's turn to that. No. 16, "Do you find from a preponderance of the evidence that Soweco's predecessor, Nor-Am, acted fraudulently when it represented to the Patent and Trademark Office on April 5th, 1971, that Larvicide was still in use in interstate commerce or in connection with fumigants intended to use as an exterminator of bugs, insects, slugs and rodents, and that the label submitted at that time shows the mark as it was actually used on the goods at the present time." Now, the answer I read out was, "Nor-Am acted fraudulently." You, I take it were voting the other way than they were and saying not acting fraudulently?

MRS. MALL: Yes. When it was first—what was brought out here I didn't feel like that to start with, it showed that they really had.

THE COURT: All right. And were you one of the last ones to change your vote on that too?

MRS. MALL: Yes, I was.

THE COURT: Was there substantial disagreement on that at first kind of like the other one?

MRS. MALL: Yes there was.

THE COURT: Now, when you finally changed your vote you were way in the minority, were you not?

MRS. MALL: Yes, I was.

THE COURT: I am assuming that. Well, I am going to—well, you don't feel embarrassed about that, that is what makes this jury system good. There is nothing wrong with that. Now, when you finally changed your vote did you do so because you were pressured because of time or because or—or simply because of all the other jurors or nearly all of the others were voting the other way and you just said, well, I will give in and just go that way?

MRS. MALL: No, they brought around some things that I hadn't considered in my vote.

THE COURT: I see. And then you considered those things, did you?

MRS. MALL: Yes.

THE COURT: And then you changed your vote for that reason, because of these other additional matters?

MRS. MALL: Yes.

THE COURT: Now, if that is not right, I don't want you to—

MRS. MALL: That's right.

THE COURT: All right. Now Mrs. Pope— Mr. Pope, excuse me.

MR. POPE: Yes, sir.

THE COURT: There were two that you disagreed on, what were those two?

MR. POPE: The same.

THE COURT: Same ones?

MR. POPE: Yes, sir.

THE COURT: Well, I don't want to take up a whole lot of your time, but you voted initially I presume on 16 and 19 opposite to what I have read here?

MR. POPE: Yes, sir.

THE COURT: And you changed your vote towards the last?

MR. POPE: Yes, sir.

THE COURT: And you were one of the last ones to change your vote?

MR. POPE: Yes, sir.

THE COURT: Why did you change your vote?

MR. POPE: Well, as you stated earlier the time, cost to the attorneys and—

THE COURT: Not because of the evidence?

MR. POPE: We could not persuade the others to change theirs, so we just—

THE COURT: Well, is it fair to say that you just changed your vote because the others were voting that way and you said, well, I had better vote along with them?

MR. POPE: Yes, sir.

THE COURT: And not because of any persuading you?

MR. POPE: No, sir.

THE COURT: All right.

Despite this testimony, Soweco contends that the verdict for Shell must be overturned on the basis of *United States v. Taylor*, 507 F.2d 166 (5th Cir. 1975), and *United States v. Edwards*, 469 F.2d 1362 (5th Cir. 1972). These cases, however, are inapposite because they are *criminal* cases involving general verdicts and thus implicate concerns—most significantly, proof of guilt beyond a reasonable doubt—that are not present in civil suits. Moreover,

■ Plaintiff's second challenge is grounded in an alleged inconsistency between Special Issue Nineteen and Special Issues Eleven and Twelve. In Special Issue Nineteen, the jury found that Shell "used the word 'larvicide' otherwise than as a trademark." In Special Issues Eleven and Twelve, the jury found that Shell used each of the product names "RABON ® Oral Larvicide" and "Poultry Spray & Larvicide" "as a word combination adopted by Shell to identify its goods and to distinguish it from those manufactured or sold by another." These answers, however, are not contradictory. Special Issue Nineteen refers only to the word "larvicide"; Special Issues Eleven and Twelve, on the other hand, concern various *word combinations*, not simply the term "larvicide." The jury could well find

that Shell intended to use the word combinations to identify its goods without intending to use the word "larvicide" as a trademark. It is difficult for us to discern how the jury could have answered Special Issues Eleven and Twelve in the negative; obviously, the word combinations were being used to identify Shell's goods. Moreover, the word combination addressed in Special Issue Eleven included the term "RABON ®," which had been trademarked by Shell. Considering these facts, the jury's finding that Shell did not use the term "larvicide" as a trademark must stand. Accordingly, we conclude that Shell must prevail on its fair-use defense to the trademark infringement claim.[30]

■ The district court erred, however, in cancelling plaintiff's registration for its

A verdict is not vitiated by the fact that a juror hesitated to agree to it, or where, in answer to the inquiry, he says it is not his verdict but he consented to it, and subsequently answers that it is his verdict, or says he consented to it under protest, *or that he did not believe the verdict right, but agreed to it for the sake of harmony.*

89 C.J.S. *Trial* § 490(2) (1955) (footnotes omitted and emphasis added). The instant jurors thus articulated permissible reasons for joining a majority of their peers in a unanimous vote on each special issue. We need not look any further than this testimony to acknowledge the unanimity of the jury's verdict.

30. Because we find that Shell is entitled to a fair-use defense, we need not consider Shell's abandonment defense, 15 U.S.C. § 1115(b)(1), or its fraudulent registration defense, *id.* § 1115(b)(2). The jury found in Special Issues Fourteen and Fifteen that plaintiff had not abandoned its trademark but found in Special Issue Sixteen that it had fraudulently registered its mark "Larvacide." We are reluctant to rely on the fraudulent registration defense because (1) there is a dearth of evidence in the record to support a finding of fraud, and (2) the answer to Special Issue 16 may be inconsistent with the jury's answers to Special Issues Fourteen and Fifteen. There was no evidence that Nor-Am intended to abandon its trademark; moreover, its products were still in interstate commerce at the time of the registration, since they were still on distributors' shelves at that time. As noted above, however, we need not probe this issue because a fair-use defense is available to defendant.

One final contention made by plaintiff does merit consideration. In Special Issues One and Three, the jury explicitly found that the ordinary consumer of agricultural chemical prod-

ucts was not likely to be confused by Shell's use of its product names. Because we have held that a finding of likelihood of confusion is a prerequisite for a trademark infringement claim, *Dallas Cap*, 510 F.2d at 1012, the jury's answers to these special issues should be sufficient to dispose of plaintiff's trademark infringement claims. Nevertheless, the jury also found that Shell's use of the term "larvicide" was an act of "unfair competition," which the judge had characterized in his instructions as "the passing off of one's goods or services as those of another, in a manner that is *likely to confuse*." (emphasis added). On this basis, plaintiff contends that it is entitled to prevail on its trademark claim. However, having carefully read the entire transcript and having considered all the requisite factors, *Amstar*, 615 F.2d at 258–259, we agree with the district court that there is "more than ample evidence" to support a jury finding that there was no likelihood of confusion and, conversely, that the jury's findings of unfair competition on the part of the defendants were "not supported by *any* evidence." (emphasis added). Moreover, we are convinced that even if there were a likelihood of confusion, the defendant would still be entitled to its fair-use defense, so long as it had met the requirements of § 1115(b)(4). To hold otherwise would effectively eviscerate the fair-use defense. If defendant's use of a term to *fairly* describe a characteristic of its goods creates a likelihood of confusion, then plaintiff should adopt some other method of distinguishing its goods from those of defendant. He cannot deprive defendant of his statutory defense once defendant has established the elements of that defense, as defendant has done here.

trademark "Larvicide." As noted above, the jury did not find that plaintiff's use of the term "larvicide" was generic *with respect to its products. See* p. 1186, *supra.* In fact, plaintiff, used its mark on products that are intended to kill many forms of animal life, not merely larvae;[31] it is more properly characterized as a "varmintcide" than a "larvicide." Nevertheless, since plaintiff's products do kill larvae, its mark may be said to be at least descriptive of its products.[32] As such, it requires secondary meaning to be protected. However, plaintiff's mark, as a result of its incontestable status, *see* nn.17, 20 and 25 and accompanying text, *supra*, is *presumed* to have secondary meaning. *See Union Carbide*, 531 F.2d at 377 ("once incontestability is established, registrant's mark is immune from challenge on any grounds not enumerated in § 1115(b)."). Consequently, plaintiff's mark is protectable and is not subject to cancellation under section 1064(c) of the Lanham Act.

### The Federal Unfair Competition Claim

■ Once the district court had disposed of the trademark claim, it turned to plaintiff's unfair competition claim under state law. Nowhere did it address plaintiff's claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[33] which has been characterized as "at least a partial federal law of unfair competition." *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 547 (2d Cir. 1956) (Clark, J., concurring). Perhaps the court felt it was unnecessary to address the section 43(a) claim because of its finding that plaintiff's

mark had become generic. Even plaintiff seems to have slighted the section 43(a) claim, since it never objected to the wording of Special Issues Seven and Nine in which "unfair competition" was defined in terms of "passing off of one's goods or services as those of another," even though passing off is not required under section 43(a). *L'Aiglon Apparel, Inc. v. Lana Lobell*, 214 F.2d 649 (3d Cir. 1954). Nevertheless, plaintiff brought a section 43(a) claim and raises it again on appeal.

We are of the opinion that defendant must prevail on this claim. There was no evidence demonstrating that Shell's use of the word "larvicide" constituted a "false description or representation" of its goods as required by section 43(a). To the contrary, the term "larvicide" accurately conveys the essence of defendant's products. As we have found above, defendant's use of the term "larvicide" was *fair* use for the purposes of the trademark infringement claim. It would make no sense to characterize defendant's use as "fair" within the meaning of the Lanham Act for the purposes of a trademark infringement claim and at the same time characterize his use as "unfair" for the purpose of a section 43(a) unfair competition claim under the same statute. For these reasons, we hold for defendant on the section 43(a) claim.

### The State Law Unfair Competition Claim

■ A state law claim of unfair competition in Texas requires the plaintiff to show that his mark is distinctive or has acquired secondary meaning. *Douglas v.*

---

**31.** Several witnesses testified that plaintiff's products were intended primarily to kill adult insects, not larvae.

**32.** Plaintiff argued at trial that his mark was "arbitrary," but we reject that contention in light of the testimony at trial that plaintiff's products *do* kill larvae.

**33.** (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall

cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

*Taylor,* 497 S.W.2d 308, 310 (Tex.Civ.App.— Houston [1st Dist.] 1973, no writ); he must also demonstrate that the public is likely to be deceived or confused: "Unfair competition results if [defendant's] use of the name is calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the particular trade to which the controversy relates." *Id.* (citing *Harrelson v. Wright,* 339 S.W.2d 712 (Tex.Civ.App.—Eastland 1960, writ ref'd n. r. e.)). The *Douglas* court's phrase "calculated to deceive" seems to suggest that there must be some intent on the part of the competitor. Other cases, however, indicate that a showing of intent is not necessary in order to prevail on a claim of unfair competition. *See, e. g., McCarley v. Welsh,* 170 S.W.2d 330, 332 (Tex.Civ.App.—Dallas 1943, no writ); *Volkswagenwerk,* 492 F.2d at 478 ("intent is not a necessary element of the tort of unfair competition."). Thus, it appears that intent is *not* necessary to prevail on an unfair competition claim in Texas. *But see Burge v. Dallas Retail Merchants Association,* 257 S.W.2d 733, 735 (Tex.Civ.App.—Dallas 1953, no writ) ("Unfair competition is predicated upon fraud.").

■ The jury found in Special Issues Seven and Nine that Shell's use of its prod-

uct names were "acts of unfair competition." Nevertheless, the judge granted a judgment n. o. v. on the unfair competition claim because, among other reasons,[34] he found that "there was no evidence to support the jury's findings of unfair competition on the part of defendants in Special Issues 7 and 9." Applying the standards of *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc), as we are bound to do in the appeal of a judgment n. o. v., we agree with the district court that a judgment n. o. v. was proper. Our review of the record does not disclose *any* evidence of unfair competition, let alone "substantial evidence . . . of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions," *id.* at 374, on plaintiff's state law unfair competition claim. Accordingly, we affirm the district court's judgment n. o. v. for defendant on this issue.

### Conclusion

We affirm the district court's judgment for defendant on the trademark infringement claim and its judgment n. o. v. for defendant on the federal and state unfair

---

**34.** The judge gave two reasons, in addition to the lack of evidence, for rejecting plaintiff's state law claim. Neither of these, however, is sufficient to uphold the judgment n. o. v.

The judge found that plaintiff had failed to prove that its mark had acquired secondary meaning, even though it was "incontestable" within the meaning of the Lanham Act:

Although the Seventh Circuit held in the *Union Carbide* case [*Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)] that the incontestability of the mark there in question created a conclusive presumption of secondary meaning it noted at p. 375 of the opinion that, "If a mark is the common descriptive name of an item, it does not qualify for registration under § 1052(f). If a mark becomes the common descriptive name of an item, it may be cancelled at any time and incontestability would be of no effect even if subsection (4) [of 15 U.S.C. § 1065] had not been enacted." *See* 15 U.S.C. § 1064(c), 1065. Thus in a case such as the one under consideration where the mark has become a common descriptive name, the presumption of secondary meaning

stemming from the mark's incontestable status under 15 U.S.C. § 1065 does not apply. This is because the mark, being a common descriptive term, is not entitled to incontestable status under 15 U.S.C. § 1065(4), and thus not entitled to any presumption to which such status would normally entail. Plaintiff's burden of proving secondary meaning is not satisfied by virtue of its mark being "incontestable."

In light of our holding that plaintiff's mark is *not* generic as applied to its products, this reasoning cannot support the judge's grant of a judgment n. o. v.

The judge also held that the jury's finding that defendant did not deliberately seek to trade on the goodwill of plaintiff (Special Issues Five and Six) defeats plaintiff's claim of unfair competition. Clearly, he found defendant's lack of deliberateness inconsistent with plaintiff's cause of action for "palming off." However, as noted above, there are numerous authorities that support the assertion that deliberate deception is not required for an unfair competition claim under Texas law. Consequently, we cannot sustain the judgment n. o. v. on this ground.

competition claims. We reverse, however, the court's cancellation of plaintiff's registration of the trademark "Larvacide."

AFFIRMED in part and REVERSED in part.

## APPENDIX

### SPECIAL ISSUE NO. ONE

Do you find from a preponderance of the evidence that the ordinary consumer of agricultural chemical products, giving that attention which such persons usually give in consuming the product in question, would likely be mistaken, confused, or deceived by Shell's use of the produce name "Rabon® Oral Larvicide" so as to cause such consumer to believe that Shell's product is in some way connected with Soweco's product named "Larvacide"?

Answer: The ordinary consumer is not likely to be confused.

In your deliberations in connection with the foregoing Special Issue No. One and the following Special Issue No. Three, you may consider the following:

In determining whether consumer is likely to be confused or likely to make mistakes, or likely to be deceived, you should consider ordinary consumers who are neither overly careful nor overly careless. Consumers includes purchasers or users of the product.

You are instructed that it is not necessary to find actual confusion in order to find a likelihood of confusion. However, evidence of actual confusion is the best evidence of a likelihood of confusion.

In answering the foregoing Special Issue No. One and the following Special Issue No. Three, you may draw on your common knowledge and experience as citizens of the community, and you may also consider the following factors:

(a) the degree of similarity or dissimilarity between the names of the plaintiff's and defendant's respective product (for example, spelling and sound of product names);

(b) the similarity or dissimilarity in design of the trademark used on the respective products of the plaintiff and defendant;

(c) the degree of similarity or dissimilarity between the plaintiff's and defendant's products (for example, the type of product, and its intended use);

(d) the similarity or dissimilarity of the retail outlets at which the products of the plaintiff and defendant are sold;

(e) the similarity or dissimilarity of the class of purchasers to whom the products of the plaintiff and defendant are sold (for example, the degree to which purchasers of one product would or would not be drawn predominantly from a different class of purchasers);

(f) the similarity or dissimilarity in the manner that the products of the plaintiff and defendant are sold (for example, the similarity or dissimilarity in packaging, displaying, or advertising the two products);

(g) the similarity or dissimilarity in the manner or method in which the respective product names are used by the plaintiff or defendant;

(h) whether in adopting the product names "Rabon® Oral Larvicide" and "Poultry Spray and Larvicide", Shell had any intent to confuse consumers as to the source of origin of the product or to take advantage of the good will or reputation of Soweco;

(i) the degree of care likely to be used by consumers in purchasing the respective products of the plaintiff and defendant;

(j) any evidence of actual confusion to consumers;

(k) other factors about the products which would tend to increase or reduce any tendency on the part of the consuming public to be confused, mistaken, or deceived as to the source or origin or connection of the products.

No one factor or consideration should be considered conclusive, but each aspect should be weighed in light of the total evidence presented at trial.

If you have answered the foregoing Special Issue No. One "The ordinary consumer

would likely be confused," then answer the following Special Issue No. Two; otherwise do not answer Special Issue No. Two.

## SPECIAL ISSUE NO. TWO

Do you find from a preponderance of the evidence that Shell wilfully used the product name "Rabon® Oral Larvicide" in causing the likelihood of consumer confusion, mistake, or deception found in Special Issue No. One?

Answer: Not required.

In connection with the foregoing issue and another issue in this charge, you are instructed that "wilfully" means to do an act voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion.

## SPECIAL ISSUE NO. THREE

Do you find from a preponderance of the evidence that the ordinary consumer of agricultural chemical products, giving that attention which such persons usually give in buying and using the product in question, would likely be mistaken, confused, or deceived by Shell's use of the product name "Poultry Spray and Larvicide" so as to cause such consumers to believe that Shell's product is in some way connected with Soweco's product named "Larvacide"?

Answer: The ordinary consumer would not likely be confused.

If you have answered the foregoing Special Issue No. Three "The ordinary consumer would likely be confused," then answer the following Special Issue No. Four; otherwise do not answer Special Issue No. Four.

## SPECIAL ISSUE NO. FOUR

Do you find from a preponderance of the evidence that Shell wilfully used the product named "Poultry Spray and Larvicide" in causing the likelihood of consumer confusion, mistake, or deception found in Special Issue No. Three?

Answer: Not required.

## SPECIAL ISSUE NO. FIVE

Do you find from a preponderance of the evidence that in using the word "larvicide," in its product name "Rabon® Oral Larvicide" SHELL deliberately sought to trade on the goodwill of SOWECO?

Answer: Shell did not so deliberately seek to trade.

In connection with the foregoing issue and a following issue, you are instructed that the word "deliberately" means wilfully or intentionally.

You are further instructed that in connection with the foregoing issue and a following issue No. Six, "good will" means the valuable asset, advantage, or benefit of a business, beyond the mere value of its specific property, which arises and grows out of a business through the general public patronage and encouragement that the business receives from its customers as a result of the name, location, reputation and success of the business or its products.

## SPECIAL ISSUE NO. SIX

Do you find from a preponderance of the evidence that in using the word "larvicide," in its product name "Poultry Spray and Larvicide" SHELL deliberately sought to trade on the good will of SOWECO?

Answer: SHELL did not so deliberately seek to trade.

## SPECIAL ISSUE NO. SEVEN

Do you find from a preponderance of the evidence that Shell's uses of its product name "Rabon® Oral Larvicide" are acts of unfair competition?

Answer: It was an act of unfair competition.

"Unfair competition" as used in the above issue and issue number Nine is defined as the passing off of one's goods or services as those of another, in a manner that is likely to confuse, or mislead potential customers into believing that such goods or services have emanated from or have been endorsed by the latter. You are advised that in answering this issue that

the plaintiff, Soweco, need not have shown actual confusion of potential customers, but only a likelihood of confusion.

If you have answered Special Issue No. Seven "It was an act of unfair competition" then answer Issue No. Eight, otherwise do not answer Issue No. Eight.

### SPECIAL ISSUE NO. EIGHT

Do you find from a preponderance of the evidence that the act of unfair competition found in the foregoing special issue was committed with the knowledge that the imitation of Soweco's trademark LARVA-CIDE was intended to be used to cause confusion, or to cause mistake, or to deceive?

Answer: No.

### SPECIAL ISSUE NO. NINE

Do you find from a preponderance of the evidence that Shell's uses of its product name, POULTRY SPRAY & LARVICIDE, are acts of unfair competition?

Answer: It was an act of unfair competition.

If you have answered Special Issue No. Nine "It was an act of unfair competition" then answer Special Issue No. Ten.

### SPECIAL ISSUE NO. TEN

Do you find from a preponderance of the evidence that the act of unfair competition found in the foregoing special issue was committed with the knowledge that the imitation of Soweco's trademark LARVA-CIDE was intended to be used to cause confusion, or to cause mistake, or to deceive?

Answer: No.

### SPECIAL ISSUE NO. ELEVEN

Do you find from a preponderance of the evidence that Shell intended to and does use the product named "Rabon® Oral Larvicide" as a word combination adopted by Shell to identify its goods and to distinguish them from those manufactured or sold by others?

Answer: Yes.

### SPECIAL ISSUE NO. TWELVE

Do you find from a preponderance of the evidence that Shell intended to and does use the produce name POULTRY SPRAY & LARVICIDE as a word combination adopted by it to identify its goods and to distinguish them from those manufactured or sold by another?

Answer: Yes.

### SPECIAL ISSUE NO. THIRTEEN

Do you find from a preponderance of the evidence that Soweco suffered damage as a result of any of the following activities by Shell?

(If in answering the preceeding [sic] issues you did not find that Shell committed any of the activities or acts inquired about below, you need not answer this issue as to such act or activities.)

You will answer "Yes" or "No" as to each activity:

(a) In trading on the goodwill of Soweco in the use of the product name "Rabon® Oral Larvicide?

Answer: No.

(b) In trading on the goodwill of Soweco in the use of the product name "Poultry Spray and Larvicide"?

Answer: No.

(c) In the acts of unfair competition by Shell's use of its product name "Rabon® Oral Larvicide"?

Answer: No.

(d) In the acts of unfair competition by Shell's use of its product name "Poultry Spray and Larvicide"?

Answer: No.

### SPECIAL ISSUE NO. FOURTEEN

Do you find from a preponderance of the evidence that prior to Soweco's acquisition of its Larvacide product line from Nor-Am Agricultural Products, Inc., Nor-Am had discontinued use of the trademark "Larvacide"?

Answer: Nor-Am did not discontinue use of its trademark "Larvacide" prior to Soweco's acquisition.

## SPECIAL ISSUE NO. FIFTEEN

Do you find from a preponderance of the evidence that Nor-Am intended not to resume the use of its trademark "Larvacide"?

Answer: Nor-Am did intend to resume the use of its trademark "Larvacide."

In determining the issues with respect to discontinuance of use and intent not to resume the use of the trademark, you are advised that these constitute what the law deems to be an abandonment which is in the nature of a forfeiture and strict proof thereof is required.

## SPECIAL ISSUE NO. SIXTEEN

Do you find from a preponderance of the evidence that Soweco's predecessor Nor-Am acted fraudulently when it represented to the Patent and Trademark Office on April 5, 1971 that "Larvacide" was "still in use in interstate commerce on or in connection with fumigants intended for use as an exterminator of bugs, insects, slugs and rodents" and that the label submitted at that time "shows the mark as actually used on the goods at the present time [April 5, 1971]?"

Answer: Nor-Am acted fraudulently.

In connection with the foregoing issue, you are instructed that "fraudulent" means an intentional misrepresentation of the truth in order to induce the Patent and Trademark Office to renew the registration of "Larvacide."

You are further instructed that "interstate commerce" means the transportation of goods and products in commercial trading from points in one state to points in another state.

## SPECIAL ISSUE NO. SEVENTEEN

Do you find from a preponderance of the evidence that on August 28, 1951, the word "larvicide" was the common descriptive name for an agent or substance for killing larvae?

Answer: Larvicide was not the common descriptive name.

## SPECIAL ISSUE NO. EIGHTEEN

Do you find from a preponderance of the evidence that as of the present date the word "larvicide" is the common descriptive name for an agent or substance for killing larvae?

Answer: Larvicide is the common descriptive name at present.

In connection with Special Issues Nos. Seventeen and Eighteen you are instructed as follows: "Common descriptive name" means a name which conveys an immediate idea of the ingredients, qualities, or characteristics of goods. A "product name" is the name of a product. Quite often, a product name is also a common descriptive name. This would certainly be the case, for example, with the word "coffee," which is the common descriptive name for the drink which is made from the beans of the coffee tree. The common descriptive name of the sweet bread which we sometimes eat for breakfast is "coffee cake." The common descriptive name for a small restaurant is "coffee shop."

It is possible that a word which is a common descriptive name, if it is used for something *other than* that for which it is in fact the common descriptive name, can also be a trademark. For example, "coffee pot" is the common descriptive name for a utensil for making or serving coffee, but a restaurant could be called "The Coffee Pot" and that would be a trademark (or more accurately, a service mark). Similarly, "coffee tree" is the common descriptive name of a tree which grows coffee beans, but a restaurant could be called "The Coffee Tree" and that would be a trademark.

"Camel" is the common descriptive name for an animal with a humped back, but it is a trademark for cigarettes.

The common descriptive name of a small class of animals is "insect," and the common descriptive name for an agent that destroys those animals is "insecticide."

Similarly, "pest" and "pesticide" are common descriptive names.

"Larva" is the common descriptive name for the immature form which hatches from the egg of many insects. "Larvae" is the plural of "larva."

## SPECIAL ISSUE NO. NINETEEN

Do you find from a preponderance of the evidence that Shell has used the word "larvicide" otherwise than as a trademark fairly and in good faith only to describe to users the nature of its products?

Answer: Shell has fairly and in good faith used the word "larvicide" only to describe the nature of its products.

In connection with the foregoing issue, you are instructed that the word "fairly" means something that is characterized by honesty and not done with deceit or wrongful intent.

The term "good faith" means something that is done with pure intent and not with an intent to injure or harass, vex or annoy.

The term "trademark" includes a word, name, symbol or device, or any combination thereof, adopted and used by a manufacturer or merchant to identify his goods and to distinguish those goods from those manufactured or sold by others.

## SPECIAL ISSUE NO. TWENTY

Do you find from a preponderance of the evidence that Soweco's delay until February 13, 1976 in bringing this action was an unreasonable delay in protecting its rights in its trademark?

Answer: Soweco's delay was not unreasonable.

In connection with the foregoing issue, you are instructed that the term "unreasonable delay" means a delay of a longer period of time than a person of ordinary prudence would have delayed in taking action under the same or similar circumstances.

If you have answered Special Issue No. Twenty "Soweco's delay was unreasonable" then answer the following Special Issue Twenty-one, otherwise do not answer Special Issue No. Twenty-one.

## SPECIAL ISSUE NO. TWENTY–ONE

Do you find from a preponderance of the evidence that Shell is placed at a disadvantage because of such unreasonable delay?

Answer: Answer not required.

## SPECIAL ISSUE NO. TWENTY–TWO

Do you find from a preponderance of the evidence that since at least 1967 Burroughs-Wellcome Co., or its predecessor, has used the word "larvicide" on its label to market its product to kill larvae?

Answer: Burroughs-Wellcome Co. or its predecessor has used the word "larvicide" to market its product since at least 1967.

If you have answered Special Issue No. Twenty-two "Burroughs-Wellcome Co. or its predecessor has used the word 'larvicide' to market its product since at least 1967" then answer the following Special Issue No. Twenty-three; otherwise do not answer Special Issue No. Twenty-three.

## SPECIAL ISSUE NO. TWENTY–THREE

Do you find from a preponderance of the evidence that Soweco knew or should have known of the use by Burroughs-Wellcome Co., or its predecessor?

Answer: Soweco did not know or should not have known of such use.

If you have answered Special Issue No. Twenty-three "Soweco knew or should have known of such use" then answer the following Special Issue No. Twenty-four; otherwise do not answer Special Issue No. Twenty-four.

## SPECIAL ISSUE NO. TWENTY–FOUR

Do you find from a preponderance of the evidence that Soweco took no action to prevent such use of the word "larvicide"?

Answer: Answer not required.

If you have found that Soweco suffered damages from the acts or activities of Shell in your answers to any of the subdivisions of Special Issue No. 13 then answer Issue No. 25, but if you have found no damages

were incurred in your answers to each subdivision of Special Issue No. 13 you will not answer Special Issue No. 25.

SPECIAL ISSUE NO. TWENTY–FIVE

Do you find from a preponderance of the evidence that any of Shell's acts or activities causing damages to Soweco (if you have so found in your answer to Special Issue No. 13) were acts that were committed maliciously, wantonly, or oppressively?

An act or a failure to act is "maliciously" done, if prompted or accompanied by ill will, or spite, or grudge, toward Soweco.

An act or a failure to act is "wantonly" done, if done in reckless or callous disregard of, or indifference to, the rights of Soweco.

An act or a failure to act is "oppressively" done, if done in a way or manner which injures, or damages, or otherwise violates the rights of Soweco with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another.

Answer: Answer not required.