**SECURITY CENTER, LTD., A Louisiana Corporation, SCL Limited Partnership through its general partner the Security Center, Ltd.**

v.

**FIRST NATIONAL SECURITY CENTERS, A Joint Venture, Donna C. Richards, Charles P. Stroble, Jeffrey L. Saus, Louis A. Rubenstein, John W. Godsey, Winston R. Youngblood, Virgil E. Morris, Jr., Albert L. Diaz, Dewey M. Metts, William H. Richards, Individually and as Joint Ventures.**

Civ. A. No. 83–6088.

United States District Court, E.D. Louisiana.

Feb. 10, 1984.

Julie E. Schwartz, Liskow & Lewis, New Orleans, La., Paul T. Meiklejohn, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiffs.

Charles F. Thensted and A. Justin Ourso, III, Barham & Churchill, New Orleans, La., for defendants.

## INJUNCTION AND REASONS

McNAMARA, District Judge.

Plaintiffs, the Security Center, Ltd. and SCL Limited Partnership, a Louisiana partnership *in commendam,* seek to permanently enjoin the Defendants, First National Security Centers, a joint venture, and the named individual joint venturers, from use of the service mark and trade name "First National Security Centers".

### I. FACTS

Since the fall of 1980, the business and building at 147 Carondelet Street in the Central Business District of New Orleans has operated under the mark "The Security Center". Actually, the Plaintiffs acquired the business in May of 1982 from Robert Oreck, a close relative of the Plaintiff's principal partners. In transferring the ownership interest, the Plaintiffs were careful to maintain the continuity of operations established by the predecessor so as to insure the clientele of management stability. Both parties agree that management stability is a crucial aspect of the private vault business. From the uncontroverted testimony, it is obvious that the service mark "The Security Center" was also transferred in the May 1982 transaction, regardless of the lack of a written assignment.[1] Thus, the first use of the service mark "The Security Center" extends to 1980.

Domiciled in what has been described as the "fortress-like" former Federal Reserve Bank, Plaintiffs offer a variety of high-security storage services, including rentals of safe deposit boxes, vault storage for precious commodities and storage for files, microfilm and computer tapes. A courier service which delivers goods to and from the storage facility is provided and office space is available in the building for rent. Recently, Plaintiffs have initiated a confidential mailing service with private mail boxes. The business and the building at 147 Carondelet Street are both known by the appellation "The Security Center" and Plaintiffs have expended considerable sums of advertising dollars in promotion of that name. In fact, "The Security Center" is recognized as a "pioneer" in the private vault industry.[2]

In January of 1983, a sign appeared at a construction site near the busy intersection of Veterans Memorial Boulevard and Clearview Parkway in Metairie, Louisiana, an adjoining suburb of New Orleans. The sign proclaimed the building under construction to be the future home of "First National Security Centers". This new business is a joint venture comprised of several individuals from Mississippi. The moving force of First National Security Centers, Thomas Richards, testified and a current Yellow Pages advertisement (Exhibit 30) corroborates, that except for a mailing service, the array of services to be offered by First National Security Centers is virtually identical to those offered by The Security Center. The opening of the First National Security Centers is imminent.

Plaintiffs commenced this action on December 16, 1983, seeking to preliminarily enjoin the Defendants from using the words "security centers" in the name of their business. At the same time, Plaintiffs moved to conduct discovery on an expedited basis. By Minute Entry dated December 22, 1983, the court granted the

---

1. Defendants' reliance on 15 U.S.C. § 1060 is misplaced; that statute only pertains to the notice of assignment of registered marks given to subsequent purchasers, and not notice to competitors of assignment.

2. So says Rick Drummond, President of the National Association of Private Security Vaults, Inc. in the NAPSV 1983 Spring Seminar Magazine at p. 6 (Exhibit 33A).

Motion for Expedited Discovery and noticed the preliminary injunction hearing for February 6, 1984. At the time of the hearing, however, the parties stipulated that the court's resolution of this matter would serve as a final adjudication on the merits, obviating the need for another trial.

## II. PASSING OFF

Since the service mark in question is unregistered, the cause of action asserted by Plaintiffs has been characterized as the common-law tort of "unfair competition" or "passing off", rather than statutory trademark infringement. In other words, Plaintiffs allege that the Defendants are attempting to "pass off" the services of First National Security Centers as those of the Plaintiff in order to take advantage of the goodwill associated with the mark "The Security Center". *See Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 702 (5th Cir.1981); *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). The Fifth Circuit Court of Appeals has read § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as prohibiting "passing off", notwithstanding the unregistered status of the service mark. *Id.* Insofar as a "passing off" action has been elevated to a federal statutory cause of action, federal decisions on the subject are my benchmark.

### A. *Likelihood of Confusion*

In order to prevail on his § 43(a) claim, Plaintiff must demonstrate a "likelihood of confusion" between the identity of the marks "The Security Center" and "First National Security Centers". 15 U.S.C. § 1114(1); *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*,

651 F.2d at 311, 314 (5th Cir.), *rehearing en banc denied*, 659 F.2d 1079 (1981); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 500 (5th Cir.1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979). "In assessing whether there is a likelihood of confusion with respect to service marks, we weigh several objective factors: type of service mark, similarity of design, similarity of service, identity of service facilities and customers, similarity of advertising media used, Defendant's intent and actual confusion." *Sun Banks*, 651 F.2d at 314.

### B. *Type of Service Mark*

Trademarks and service marks are classified into four somewhat overlapping categories, to-wit: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir.1983). In a trademark infringement action, the above classifications are utilized to determine whether the phrase was initially registerable or protectible. Thus, the foregoing analysis is the threshold issue in an infringement case. *Id.* Although the case at bar is not an infringement action *per se*, the classification of the mark is most certainly relevant to the "likelihood of confusion" standard. *Sun Banks*, 651 F.2d at 315.[3]

Without immersing into a detailed analysis, the two extreme classifications—generic and arbitrary or fanciful—can be immediately eliminated. A generic term, which refers to the basic nature of the articles or services, is not subject to protection.[4] *Zatarains*, 698 F.2d at 790. Conversely, an arbitrary or fanciful term, which bears no relationship to the particular product or service, is protectible.[5] *Id.* at 791. There is nothing fanciful about the

---

3. Generally, the inquiry made in an action for trademark infringement mirrors that which is made in an action for unfair competition. *Boston Professional Hockey Association, Inc.*, 510 F.2d at 1010.

4. For instance the word "ivory" is generic of elephant tusks. *Soweco, Inc. v. Shell Oil Co.*,

617 F.2d 1178, 1183 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981).

5. The terms "Ivory" and "Kodak" are fanciful terms applied to soap and photographic supplies, respectively. *Zatarains*, 698 F.2d at 791.

term "security centers" when applied to the services which are offered by the parties. Nor can it be said that "security centers" is a generic term for the private vault storage industry.[6]

█ As in *Zatarains*, this controversy focuses on whether the disputed service mark is descriptive or suggestive. Quite simply, a descriptive term is one that describes the product or services, whereas a suggestive term suggests or subtly connotes an identifying feature about the products or services. A suggestive mark is protectible; a descriptive mark is not, unless the mark acquires a secondary meaning in the minds of consumers. *Sun Banks*, 651 F.2d at 315. When one tries to apply these definitions to a live controversy, the simplicity ends.

In *Zatarains*, one of the most palatable entrees ever concocted by the chefs of the Fifth Circuit[7] the court identified several tests helpful in determining whether a term is descriptive or suggestive. 698 F.2d at 792–93.

One test looks to the dictionary definition, a reliable barometer of the significance the public affords words. *Id.* at 792. A perusal of Websters Third New International Dictionary (1961) reveals five separate meanings, with numerous refinements, given to the word "security". Among the various broad meanings of the word, all of which relate to the state of being secure, are safety, confidence, dependable, stability, guaranty and protection. Included in the refinements beyond the broad meaning are "a written obligation of ownership" (i.e., stocks and bonds), "measures taken to guard against espionage", "penal custody" and "sureness of technique".

Likewise, under the word center one finds numerous meanings, most pertaining to a "nucleus" or "middle". More pertinent to this matter, center is also defined as a "cluster" or "gathering point". *See also Vision Center v. Opticks, Inc.*, 596 F.2d 111, 116 (5th Cir.1979). The words "security" and "center" do not appear together in the dictionary.

The primary aspect of the services offered by the parties is storage—a secure and specialized type of storage, but storage nonetheless. While "center", by itself, may be descriptive of the feature of an availability of various types of services in one location, mere use of the word center without a modifier describes no business. What kind of "center"? Indeed, the key word is "security", and the dictionary does not pinpoint or describe the specific meaning the parties attach to "security".

Thus when one reads the phrase "security centers", the "center" described is not necessarily a center for providing secure storage facilities. *Cf. Id.* at 117. In fact, the Yellow Page advertisements (Exhibits 29–31) list both parties under "Safe Deposit Box Rental". Under the heading "Storage" in the Yellow Pages, the Defendants', but not the Plaintiffs' business is listed. Neither parties are listed under the main heading "Security" or its sub-topic headings "Security Consultants", "Security Control Equipment & Systems", "Security Guard & Patrol Service", or "Security System Consultants". The point is this: if "security" has the descriptive quality that Defendants contend, a consumer of its "security" services turning to the telephone listings under security would find only wrong numbers. In my book(s), Defendants fail both the dictionary and the "Yellow Page" tests.

█ The "imagination test" measures "the relationship between the actual words of the mark and the product to which they are applied." The test asks whether imagination, thought and perception is required

---

6. Rick Drummond opined that, in light of the "evolution" of the private vault industry, the term "security centers" is generic. However, only a small percentage of the members of the NAPSV use the subject words in their names or to describe their services. *See* p. 728 *supra*.

7. The issue in *Zatarains* dealt with the protection to be afforded to the marks "Fish-Fri" and "Chick-Fri". 698 F.2d at 788.

to reach a conclusion as to the nature of goods or services, or whether the term standing alone conveys information as to the characteristics of the product. *Zatarains*, 698 F.2d at 792. If imagination is required, it is a suggestive term. Defendants lose on this count also. One does not immediately grasp the nature of the parties' business when reading the term "security centers". The phrase may just as easily conjure up thoughts of a stock brokerage or seller of crime prevention devices as it does of a private vault facility.

■■■ Another instructive test is whether competitors would be likely to need the terms used in the service mark in describing their products or services. *Id.* at 793. In other words, is it difficult to identify the services offered without using the suspect word(s)? Unlike the words "fish" and "fry" there is no paucity of synonyms for the word "security". *Cf. Id.* Rick Drummond, president of the trade association to which both parties belong, testified that only 12 of the 105 members that offer services similar to that of the parties use the word "security" or "center" or a combination thereof, in their titles. Thus, the final test for descriptiveness—the extent of actual use by those marketing a similar service—also indicates that numerous terms exist which are used to describe the services offered by these parties.[8] Adding up the results of the descriptive—suggestive tests, I find that the service mark "security centers" is suggestive and thus more subject to protection.

## C. Other "Confusion" Factors

A weighing of the other factors relevant in determining the "likelihood of confusion" indicate that such a likelihood is indeed present in this case. The service marks are obviously very similar since both parties use "security center" in the titles of their businesses.[9] Significantly, as stated earlier, First National Security Centers will offer services virtually identical to those of The Security Center.

Considering the geographical separation between the businesses, there is no real danger of confusing the identity of service *facilities* by customers. However, insofar as the target customers (described as an upper middle to upper economic class individual) of both businesses are similar, the identity of potential customers is the same. Both businesses will or do attract the bulk of their client base from the metropolitan New Orleans area.[10]

Perhaps since "First National Security Centers" has yet to open for business, Defendants have not embarked on an extensive media campaign which utilizes television and radio as have Plaintiffs. Nevertheless, both parties use newspaper advertisements and mailings to potential customers.

Regarding the intent of the Defendants in selecting the title First National Security Centers, it is interesting (although certainly not conclusive) to note that Thomas Richards testified that "First National" was selected because the term is associated with banks and therefore conveys an aura of stability. Although Richards testified that he became aware of The Security Center in January of 1982, after he had selected the title "First National Security Centers" for Defendants approximately in late 1981, the first recorded use of "First National Security Centers" was not until May 24, 1982. Considering that Richards hoped to profit from the use of "First National", it is not unlikely that he hoped to take

---

8. The testimony revealed that a recurring term used in the titles of the companies is "safe" or "safe deposit".

9. The trademarks are certainly distinctive, Plaintiffs employing the letters SC circumscribed by a wreath, and Defendants using an open vault door. But, it is the words themselves and not the logos which are at issue.

10. The private vault business is by no means a purely local endeavor. The Security Centers has customers in 35 states and 12 foreign countries.

advantage of any goodwill associated with The Security Center.

While there is evidence of actual confusion on the part of at least one person, I do not, nor need not, place undue weight on this finding to find that a *likelihood* of confusion exists. Since First National Security Centers is an unopened business and a newcomer to the New Orleans area, it would be virtually impossible to demonstrate any meaningful actual confusion.

Defendants complain of the absence of a survey, a tool often used in trademark litigation. A survey is only useful if the interrogatories are artfully drawn to classify the mark properly. *See Zatarains*, 698 F.2d at 793 n. 4. In any event, a survey would be of little use in this case to discern any confusion between the identity of the parties because of Defendants' late arrival on the scene. Insofar as a survey is probative on the issue of secondary meaning, that question only becomes relevant if the mark is deemed descriptive.

## III. CONCLUSION

Because I find that the totality of circumstances indicates a likelihood of confusion between the service marks "The Security Center" and "First National Security Centers", Plaintiffs have succeeded in securing its service mark.

Accordingly,

IT IS ORDERED that Defendants, First National Security Centers, A Joint Venture, Donna C. Richards, Charles P. Stroble, Jeffrey L. Saus, Louis A. Rubenstein, John W. Godsey, Winston R. Youngblood, Virgil E. Morris, Jr., Albert L. Diaz, Dewey M. Metts, William H. Richards, Individually and as Joint Ventures, be and they are hereby permanently enjoined from using the words "Security Center", in either the singular or plural number, as a service mark, trademark or in advertising in any manner or media (such as television, radio, newspapers, billboards, signs, sales literature or informational pamphlets) or on stationery.