**SECURITY CENTER, LTD. A Louisiana Corporation, SCL Limited Partnership Through Its General Partner The Security Center, Ltd., Plaintiffs-Appellees,**

v.

**FIRST NATIONAL SECURITY CENTERS, A Joint Venture, Donna C. Richards, Charles P. Stroble, Jeffrey L. Saus, Louis A. Rubenstein, John W. Godsey, Winston R. Youngblood, Virgil E. Morris, Jr., Albert L. Diaz, Dewey M. Metts, and William H. Richards, Individually and as Joint Venturers, Defendants-Appellants.**

No. 84–3120.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1985.

Rehearing Denied Feb. 27, 1985.

---

Barham & Churchill, Charles F. Thensted, New Orleans, La., for defendants-appellants.

Liskow & Lewis, Julie E. Schwartz, New Orleans, La., Hopgood, Calimafde, Kalil, Blaustein & Judlowe, Paul T. Meiklejohn, New York City, for plaintiffs-appellees.

Before REAVLEY, TATE and HILL, Circuit Judges.

REAVLEY, Circuit Judge:

This case involves the susceptibility to trademark protection of the phrase "security center," when used in reference to a business housing private storage vaults.

The business in question also includes pick-up and delivery services, leasing office space, and mail services.

The primary issue is whether the mark "security center" is so distinctive as to be protected under trademark law. The trial court held it to be a distinctive mark and accorded it protection. *Securities Center, Ltd. v. First National Securities Centers*, 592 F.Supp. 723 (E.D.La.1984). Finding that the name is not a protectable mark, we reverse the judgment of the court below and render judgment for First National Security Centers.

## I. BACKGROUND

The Security Center opened in downtown New Orleans in the fall of 1980, and received nationwide publicity focusing on its fortress-like building, formerly the Federal Reserve Bank building. It was one of the first businesses to provide an array of services such as storage of valuables in private vaults, the leasing of office space, pick-up and delivery services, and the receipt and forwarding of mail.

In May 1982, the appellant began using the name First National Security Centers. In January 1983, a sign appeared at a construction site in Metairie, Louisiana, announcing to the public that the building under construction would house First National Security Centers. The services to be offered by First National were virtually identical with those of the Security Center.

In December 1983, the Security Center sought to enjoin First National from using "security center(s)" in its name. A preliminary injunction was granted. On February 10, 1984, the district court issued a judgment and opinion stating that the mark "The Security Center" is suggestive, and that it is liable to confusion with "First National Security Centers." The court therefore permanently enjoined First National from using the phrase "security center(s)" in its name.

## II. FEDERAL JURISDICTION AND OUR STANDARD OF REVIEW

■ Security Center brought suit under the Lanham Act, 15 U.S.C. §§ 1051–1127 (1982), basing jurisdiction on 15 U.S.C.A. § 1121 (West Supp.1984).[1] It relied substantively on 15 U.S.C. § 1125 (1982),[2] which makes actionable a person's use of a false designation of origin for goods or services. Registration of a trademark or service mark is not a prerequisite for recovery under this provision. *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

■ The categorization of a term as distinctive or nondistinctive is a factual issue.[3]

1. The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.
   15 U.S.C. § 1121 (West Supp.1984).

2. The statute reads in part:
   Any person who shall ... apply, or annex, or use in connection with any ... services ... a false designation of origin ... including words or symbols tending falsely to describe or represent the same, and shall cause such ... services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin ..., or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125 (1982).

3. Although we are bound to follow this circuit's previous holdings on this point, a better rule might be to treat the data giving rise to the categorization as matters of fact, and the ultimate categorization as a matter of law. Thus imaginativeness and likelihood of confusion (see discussion *infra* under Distinctiveness) would be factual matters, but the weighing of these factors to determine whether a mark is distinctive would be a matter of law. This is not now the law of this circuit; we merely suggest it as a more workable paradigm for reviewing courts, and as being more in line with the traditional delineation between law and fact.

In making this suggestion we are mindful of the error of independent review of an "ultimate fact." *See Pullman-Standard v. Swint*, 456 U.S. 273, 286 n. 16, 102 S.Ct. 1781, 1788 n. 16, 72 L.Ed.2d 66 (1982). Even so, as Lord Chancellor Halsbury long ago observed in the context of

**1298**

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 792 (5th Cir.1983); *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 n. 12 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). Hence, we review the district court's findings on this issue under the clearly erroneous standard of Fed.R.Civ.P. 52(a). *Zatarains*, 698 F.2d at 792.

## III.  THE HALLMARKS OF THE TRADE

■  "Trademark cases often involve line drawing in areas that are inherently 'fuzzy.'" *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1182 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981). This case is no exception. In order to bring these indistinct lines into better focus, this circuit has reduced the inquiry to two basic questions. The first is "whether the plaintiff has a protectable property right in the name it seeks to defend from use by others." *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 786 (5th Cir.1984). The second question—and the ultimate issue— is infringement, as judged by likelihood of confusion. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir.1984). Only when a trademark "rises to the level of trademark protectability—either by a showing that it is sufficiently distinctive or has acquired secondary meaning—does the question of likelihood of confusion become relevant." *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 (5th Cir.1984) (footnote omitted).

### A.  Protectability

#### 1.  Distinctiveness

To ascertain whether the mark is distinctive, we must first categorize it: Is the mark generic, descriptive, suggestive, or fanciful? These categories indicate different levels of protectability. "Although [they] are meant to be mutually exclusive, they are spectrum-like and tend to merge imperceptibly from one to another. For this reason, they are difficult to define and, quite frequently, difficult to apply." *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). The lower court aptly noted that "security center" could be neither a generic [4] nor a fanciful name, so our analysis must focus on determining whether it is descriptive or suggestive.

The *Vision Center* court distinguishes descriptive from suggestive terms thus:

A descriptive term identifies a characteristic or quality of an article or service and, though ordinarily not protectable, may become a valid trade name if it acquires a secondary meaning. A suggestive term suggests, rather than describes, a characteristic of the goods or services and requires an effort of the imagination by the consumer in order to be understood as descriptive. A suggestive term requires no proof of secondary meaning in order to receive trade name protection.

*Id.* at 115–116 (citations and footnotes omitted). This distinction is widely accepted and has met with approval in other cases of this circuit. *See, e.g., Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790–91 (5th Cir.1983); *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*, 651 F.2d 311, 315 (5th Cir.1981).

#### 2.  The Descriptive/Suggestive Paradigm

■  From the caselaw we distill two overarching questions to be considered in de-

---

trademarks, "The question of law is so constantly mixed up with the various questions of fact ... that it is sometimes difficult when examining former decisions to disentangle what is decided as fact and what is laid down as a principle of law." *Reddaway v. Banham*, 1896 A.C. 199, 204 (H.L.).

**4.** There does appear to be *some* evidence that it is becoming a generic term. First National cites

several articles and advertisements, all admitted into evidence, in which "security center" is written in lower case. The trade is indisputably a new one, and, with our language in a state of constant flux as it is, "security center" may soon be added to the lexicons. Dictionaries lag behind linguistic realities, however, so the dictionary test may be of questionable validity in many instances.

termining whether a mark is descriptive or suggestive. First, we must inquire how much imagination is required on the consumer's part in trying to cull some indication from the mark about the qualities, characteristics, effect, purpose, or ingredients of the product or service. *See Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 792 (5th Cir.1983); *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 116 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). Second, we determine whether sellers of similar products are likely to use, or actually do use, the term in connection with their goods. *Zatarains,* 698 F.2d at 793; *Vision Center,* 596 F.2d at 116–17. The other questions elaborated by commentators[5] and mentioned by the courts are subsumed within, and subordinated to, these larger questions. The weight of these two considerations, taken together, determines the proper classification of the mark.

On the issue of imaginativeness, we read "security center[s]" without saddling the phrase with unlikely meanings to demonstrate that it is ambiguous, hence imaginative, hence suggestive. A plausible interpretation of the phrase—not in vacuo, but in its natural setting—would be "a center where security is afforded one's property." To arrive at this definition, one must jettison all patently extraneous definitions of either "security" or "center." Even so, the phrase is not unambiguous. It is less ambiguous, however, when one adds into the equation the context and environment in which the mark is used—the natural environment in which the consumer would meet with the phrase. Nevertheless, there is no reason why a descriptive phrase could not be ambiguous—many, if not most, are.[6]

■ To be descriptive, a term need only describe the essence of a business, rather than to spell out comprehensively all its adjunct services. The essence of both the Security Center and First National Security Centers is that they provide secured storage facilities. They also engage in various related activities, but safekeeping is the gist of the trade. No English word would "describe" all the activities engaged in; and yet this fact alone would not make the uncomprehensive term "security" suggestive, merely because it might take imagination to deduce that the other activities play a part in the business. Indeed, even the most fecund imagination might not arrive at such a conclusion, though it might readily surmise accurately about certain characteristics of the business. For instance "center," modified as it is by "security," must needs be a place, probably a building. And "security," vague though it is, does connote certain qualities and characteristics about this "center." We conclude, then, that the mark, though hardly transparent, does give the unknowing consumer some idea of the function, quality, or components of the business. Still, we note that "security center" is just as likely to suggest a jail as a private vault.

The imagination test might usefully be reversed by inquiring whether the first user has devised a term of some creativity or cleverness, as opposed to merely selecting a term that anyone might readily have chosen. (Any dunce could come up with a generic term, for example.) Creativity on the part of the mark's inventor is a correlative of imagination on the part of the consumer. With this correlative in mind, we have no hesitation in stating that only a modicum of creativity was needed to arrive at "security center" as a name for the business in question. The name is merely a coupling of two quite common English words, and the coupling itself exhibits little originality.[7]

5. *See, e.g.,* 1 J.T. McCarthy, Trademarks and Unfair Competition § 11:22 (1973).

6. It was therefore beside the point for the trial court to note that most of the dictionary meanings of "center" pertain to "nucleus, middle, cluster, or gathering point," or that "security"

may mean "safety, confidence, dependable [sic], stability, guaranty and protection."

7. See the discussion immediately following, which indicates that a number of security-vault businesses nationwide were inventive enough to adopt "security center" in their names.

We turn now to the issue whether those engaged in similar businesses have used the phrase, or are likely to do so. *See Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 793 (5th Cir.1983). "[T]he fact that a term is not the only or even the most common name for a product is not determinative, for there is no legal foundation that a product can be described in only one fashion." *Id.* The trial court stated in its opinion and order:

> Rick Drummond, president of the trade association to which both parties belong, testified that only 12 of the 105 members that offer services similar to that of the parties use the word "security" or "center" or a combination thereof, in their titles. Thus, the final test for descriptiveness—the extent of actual use by those marketing a similar service—also indicates that numerous terms exist which are used to describe the services offered by these parties.

■ After examining all the testimony on this point, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Mr. Drummond did not testify that *either* "security" or "center" had been used in twelve of 105 trade names, excluding First National. Rather, he stated that *both* words appear in twelve of the names in his files, synopsized in exhibit 26. Nine of these use the phrase "security center," and three others have intervening words. Exhibit 26 is instructive insofar as it reveals twenty-six other private vault operations that use in their names "security" (in some form), and seven more that use "center." It is unclear from the testimony whether the roster of forty-five businesses using either "security" or "center" is to be compared against a total of ninety-nine extant businesses, or against the sixty-five that are members of Mr. Drummond's trade association. We do not think it matters; First National succeeded in demonstrating both likelihood of use and actual use.

Before leaving this point, we should spell out the policy underlying this particular prong of the investigation and demonstrate how our outcome serves that policy. We look into actual and likely use of a mark in order to determine whether its protection, i.e., its exclusion from the language freely available for commercial use, interferes with competition among providers of the same product or service. The more users there are of a term, the more its protection in a given case would be commercially disruptive and unfair to competitors. Under our jurisprudence, the same holds true even for *likelihood* of use. *See, e.g., Zatarains*, 698 F.2d at 793; *Vision Center*, 596 F.2d at 116. Given the number of enterprises throughout the nation that use "security center" in some form, the burgeoning nature of the industry, and the evidently increasingly common generic use of the term in some form,[8] it would disserve the public to sanction use of the term by only one business in a given region, when other words can readily be affixed to the term for purposes of differentiation and clarity as to source. When we consider the net effect of our two paramount concerns within the descriptive/suggestive paradigm—imaginativeness, and actual and likely use of the mark—we are convinced that the scales are tipped decisively on the side of descriptiveness, hence nondistinctiveness.

### 3. Secondary Meaning

■ Even though the mark is descriptive, it may rise to the level of protectability if shown to have acquired secondary meaning, *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980), an established relation and following among consumers. The trial court, finding the mark to be suggestive, made no finding of fact on this issue. We conclude that the evidence presented at trial was not sufficient to raise a factual issue on secondary meaning; indeed, we

---

**8.** *See supra* note 4.

find *no* evidence of secondary meaning aside from advertising.

■ To establish secondary meaning, "a plaintiff must show that the primary significance of the term in the mind of the consuming public is not the product but the producer." *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir.1984) (citing *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938)). This court in *Bank of Texas* identified five types of evidence that are considered in ascertaining whether secondary meaning has attached to a mark: (1) survey evidence; (2) the length and manner of use of the name; (3) the nature and extent of advertising and promotion of the name; (4) the volume of sales; and (5) instances of actual confusion. *Id.*

Of these types of evidence, "the authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir.1983). It is the most persuasive because

> [t]he chief inquiry is the attitude of the consumer toward the mark; does it denote to him a "single thing coming from a single source"? Short of a survey, this is difficult of direct proof.

*Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 849 (5th Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970) (quoting *Coca-Cola Co. v. Koke Co.*, 254 U.S. 143, 146, 41 S.Ct. 113, 114, 65 L.Ed. 189 (1920). Quoting this passage, the *Vision Center* court considered the lack of evidence in the form of an objective survey a significant hindrance to meeting the standard of proof required. 596 F.2d at 119.

We find the hindrance here insurmountable, especially when considered with the paucity of other evidence purporting to show secondary meaning. The Security Center attempts to establish secondary meaning on the basis of sums spent in advertising, of the mark's use for two years before First National set up shop,

and of First National's alleged imitation or appropriation of the mark. With regard to advertising, this court has held that "the question is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of [the trademark] to the consuming public." *Aloe Creme Laboratories*, 423 F.2d at 850 (emphasis in original).

Unless the public equates the entity with the service, there is no secondary meaning; it was the plaintiff's burden to demonstrate the likelihood that customers would mistakenly subscribe to defendant while thinking they were subscribing to plaintiff. From the documentation in the record, we cannot infer that the advertising by the Security Center even approached the level of effectiveness that would give rise to secondary meaning.

As to time spent in the market, this court has stated: "Although one party may have been successful in imbuing a name with secondary meaning in three short years, that does not mean that length of time alone is sufficient to establish secondary meaning." *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 788 (5th Cir.1984) (holding that continuous use by neighborhood bank of trademark for nine years is insufficient to establish secondary meaning throughout county). Finally, the Security Center has not adduced facts that even raise an issue whether First National appropriated the mark through imitation.

The question of First National's intent in choosing its name merits further discussion. We are not unmindful of the role of connotation in the selection of trade names. Part of the trial judge's rationale was that "numerous terms exist which are used to describe the services offered by these parties." In a footnote, he cites "safe" and "safe deposit" as two such terms. The court then comments, after noting that "First National" was chosen because it is associated with banks and therefore suggests stability: "Considering that Richards [First National's manager] hoped to profit from the use of 'First National,' it is not unlikely that he hoped to take advantage of any goodwill associated with The Security

Center." We cannot say that the record supports any such inference, or that First National's choice of either "First National" or "Security Center" in its name is in any way underhanded or improper.

In sum, we hold that because "security center" is merely descriptive and not suggestive, it is not a distinctive mark that is inherently protectable. Further, it has not gained protection by the acquisition of secondary meaning.

### B. Infringement: Likelihood of Confusion

Although we do not reach the question of infringement unless a mark is found to be protectable, we nevertheless observe the improbability of any confusion in this case. The trial court found that, "[c]onsidering the geographical separation between the businesses, there is no real danger of confusing the identity of the service *facilities* by customers."[9]

This court has stated that "[c]ommon words in which no one may acquire a trademark because they are descriptive or generic may, when used in combination, become a valid trademark." *Association of Co-operative Members, Inc. v. Farmland Industries, Inc.*, 684 F.2d 1134, 1140 (5th Cir.1982), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983). Thus "[t]he commercial impression of a trademark is derived from it as a whole, not from elements separated and considered in detail. For this reason it should be considered in its entirety." *Estate of P.D. Beckwith, Inc. v. Commissioner of Patents*, 252 U.S. 538, 545–46, 40 S.Ct. 414, 417, 64 L.Ed. 705, 708 (1920). The full name may either invite or avoid confusion. The prefixed words "First National" in the appellant's name differentiate it from that of the appellee, the Security Center. On this point, as on many others, the case seems analogous to *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 118 n. 21 (5th Cir.1979) (stating that the prefix "Pearle" before "Vision Center" is legally necessary

to distinguish the entity and prevent unfair competition, where established competitor's name is merely "Vision Center"), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). The difference between the full names must minimize any potential confusion between these parties.

### IV. CONCLUSION

We find the trial court's characterization of "security center" as suggestive to be clearly erroneous. Plaintiff failed to prove imaginativeness or likelihood of confusion. The judgment is reversed and the suit is dismissed.

REVERSED AND DISMISSED.

---

**9.** The nature of this business suggests customers who would be unlikely to confuse the establishments. We have noted in the past that confusion is more likely if the products or services in question are "impulse" items or are inexpensive. *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 191–92 (5th Cir.1981).