**MARCH MADNESS ATHLETIC ASSOCIATION, L.L.C.,**
Plaintiff,

v.

**NETFIRE, INC. and Sports Marketing International, Inc., Defendants,**

v.

**National Collegiate Athletic Association and Illinois High School Association, Third-party Defendants.**

No. 3:00–CV–0398–R.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 15, 2001.

Theodore Stevenson, III, Hughes & Luce, Dallas, TX, Douglas N. Masters, Ram Padmanabhan, Mark P. McKenna, Bradley L. Cohn, Pattishall McAuliffe Newbury Hilliard & Geraldson, Chicago, IL, Wayne F. Plazaq, Rooks Pitts & Poust, Chicago, IL, for March Madness Athletic Ass'n, LLC

R. Brent Cooper, Adam Alexander, Cooper & Scully, Dallas, TX, for Netfire, Inc., Sports Marketing Intern., Inc.

Jeffrey C. Mateer, Randal C. Shaffer, Mateer & Shaffer, Dallas, TX, for National Collegiate Athletic Ass'n

## MEMORANDUM OPINION AND ORDER

BUCHMEYER, Chief Judge.

Now before this court is Netfire, Inc. and Sports Marketing International, Inc.'s

Motion for Summary Judgment, March Madness Athletic Association, L.L.C.'s **Cross–Motion for Partial Summary Judgment,** and Illinois High School Association's **Motion for Partial Summary Judgment,** filed jointly on June 26, 2001. For the reasons stated below, Netfire, Inc. /Sports Marketing International, Inc.'s Motion is **DENIED,** March Madness Athletic Association, L.L.C.'s Cross–Motion is **DENIED,** and Illinois High School Association's Motion is **GRANTED.** SMI's counterclaim for conversion is hereby **DISMISSED WITH PREJUDICE.**

### *Background*
### I Procedural Background

On February 22, 2000, Illinois High School Association (IHSA) filed suit in this court for trademark infringement, dilution, and unfair competition against Defendants, Netfire, Inc. (Netfire) and Sports Marketing International, Inc. (SMI). On March 17, 2000, IHSA filed its First Amended Complaint, adding March Madness Athletic Association, L.L.C. (MMAA) as the second Plaintiff. SMI subsequently filed an original and an amended counterclaim against IHSA for tortious interference with business relations and tortious interference with contract.

On December 11, 2000, this court denied IHSA's motion to dismiss SMI's counterclaims. On February 12, 2001, United States Magistrate Judge Sanderson granted an unopposed motion for IHSA to withdraw as a Plaintiff, leaving MMAA as the sole Plaintiff of record in this case. On March 6, 2001, MMAA filed a Second Amended Complaint, adding the claim of cybersquatting, pursuant to the Anticybersquatting Consumer Protection Act, 15

U.S.C. section 1125(d). The Defendants' Second Amended Answer and Counterclaims added counterclaims for conversion against IHSA, and for fraud and civil conspiracy against IHSA and the National Collegiate Athletic Association (NCAA).

Defendants now move this court to grant Summary Judgment on all of the Plaintiff's claims on the ground that the Plaintiff does not have a protectable mark in the phrase "March Madness." In the alternative, the Defendants ask this court to grant summary judgment only for the cybersquatting claim. Along with its Response to the Defendants' Motion, Plaintiff filed a Cross–Motion for Partial Summary Judgment, asking this court to hold, as a matter of law, that MMAA has a protectable mark in March Madness for all of the goods and services covered by its registrations and use. Former Plaintiff and Third-party Defendant, IHSA, has also filed a Motion for Partial Summary Judgment on SMI's counterclaim for conversion.

### II Factual Background

This case centers on the evolving use and meaning of the phrase "March Madness." The first appearance of this phrase may have been as early as 1939, when IHSA began using it in reference to its annual high school basketball tournament, which takes place in the month of March. A variation of the phrase appears in a colorful poem about the IHSA tournament, written in 1942.[1] Until the early 1980s, the phrase was used by IHSA, the media, and the public, primarily in the state of Illinois, to describe IHSA's annual tournament. In 1982, March Madness took on a

---

1. An excerpt of the poem follows: .
 The gym lights gleam like a beacon beam
 And a million motors hum
 In a good will flight on a Friday night;

For basketball beckons, "Come!"
A sharp-shooting mite is king tonight.
The Madness of March is running. (IHSA App. 4.)

new connotation when a CBS reporter from the Chicago area began to use the phrase to describe the NCAA men's Division I basketball tournament. The new use quickly caught on, and from the 1980s to the present, March Madness has been used by the media and members of the public nationwide to denote the NCAA tournament.

In either 1987 or 1988, IHSA filed an application to register March Madness with the Patent and Trademark Office (PTO). Upon submitting its application, IHSA learned that a company called Intersport also had a pending application for March Madness. Intersport sought to register the mark for use in connection with a television show involving a panel of athletes and sports commentators discussing the NCAA tournament. On December 12, 1989, Intersport obtained a registration for March Madness for "entertainment services, namely, presentation of athletic and entertainment personalities in a panel forum." (Plf.App.323.) At some point shortly thereafter, IHSA successfully registered the phrase "America's Original March Madness."[2] Subsequently, IHSA initiated cancellation proceedings against Intersport's March Madness mark. However, in 1991, IHSA withdrew its cancellation petition pursuant to an agreement between the parties in which Intersport agreed not to interfere with IHSA's use of March Madness in any context other than a panel forum related to collegiate basketball.

In December 1994, Intersport and IHSA formed a joint venture called March Madness, L.L.C. (MM), in order to consolidate and manage their respective rights in March Madness. Evidently, MM, and specifically, IHSA, believed it owned a much greater right to March Madness than that which was described in the Intersport registration. For example, shortly after its formation, MM licensed March Madness to Pepsi–Co for use in "basketball-themed promotions" for Pepsi–Co products. (Plf.App.257.) In addition, the new venture made at least two attempts to protect its perceived rights in March Madness through cease and desist letters, including a letter to CBS. Moreover, at some point in 1995, IHSA independently licensed March Madness to ten different states for use in connection with the high school basketball tournaments in those states.

In mid–1995, the parties decided to dissolve March Madness, L.L.C., at which time Intersport assigned its registered mark to IHSA and agreed to act as a marketing agent on IHSA's behalf to license March Madness to third parties. Thus, by mid–1995, IHSA owned a registered mark in March Madness for the presentation of athletic and entertainment personalities in a panel forum, and through MM, it had licensed the use of March Madness for basketball-themed Pepsi–Co products. Moreover, in 1996, IHSA licensed March Madness to Wilson Sporting Goods Company for use in connection with basketballs and other merchandise.

During this time period, NCAA, members of the media, and members of the public, continued to use March Madness in reference to the NCAA collegiate basketball tournament. According to Scott Bearby, Assistant General Counsel for NCAA, NCAA believed it had a common-law trademark in March Madness by the early 1980s, and it claims to have licensed March Madness to many of its corporate partners beginning in 1988. Moreover, beginning in 1993, March Madness appeared on NCAA marketing materials as one of the trade-

---

**2.** Since that time, IHSA has obtained a few different registrations for America's Original March Madness, as well as registrations for "March Madness Experience."

marks available to potential licensees. In addition, NCAA's own use of March Madness in advertisements often contained a "TM," signifying that the NCAA had a protectable mark in the phrase.

However, as late as 1995, NCAA's standard licensing agreements did not list March Madness as an NCAA mark to be included in the license grant.[3] Moreover, NCAA did not attempt to obtain a federal registration for March Madness until 1994. When it did apply for a registration, NCAA discovered that Intersport had previously registered the phrase. Shortly thereafter, NCAA initiated cancellation proceedings against Intersport's mark. By 1996, the cancellation proceedings had not been successful, and IHSA, the new owner of the registered March Madness trademark, sought a preliminary injunction against GTE Vantage Inc. (GTE), one of NCAA's March Madness licensees, to prevent GTE from using March Madness in a video game related to the NCAA tournament.

The Central District of Illinois denied IHSA's request for an injunction on the ground that IHSA was not likely to succeed on the merits because its March Madness mark had been diluted by the association of March Madness with the NCAA basketball tournament. (Plf.App.343.) Moreover, the court opined that the NCAA had established a common law mark for the use of March Madness in connection with the NCAA tournament. (Plf.App.346.) On appeal, the Seventh Circuit upheld the District Court's ruling, holding that March Madness had become a "dual-use term," analogous to a generic term that the public has affixed to something other than the Illinois high school basketball tournament. *Illinois High School Association v. GTE Vantage Inc.*, 99 F.3d 244, 247 (7th Cir.1996). Thus, the court held that the preliminary injunction was rightly denied. *See id.* at 248. Moreover, the court stated that the suit appeared to lack any merit and that on remand the district court should enter judgment for the defendant. *See id.* at 248. However, the court explained that it was not opining on the scope of NCAA's or IHSA's trademark rights, "beyond ruling that IHSA's rights do not extend to the NCAA tournament and to merchandise sold in connection with that tournament." *Id.*

At approximately the same time that IHSA and NCAA were engaged in litigation over March Madness, Defendant Netfire purchased the domain name "marchmadness.com" from a man named Adam Stein. Mr. Stein had previously registered the domain name with Network Solutions, Inc. (NSI), but he was not using it at the time Netfire approached him. The evidence reveals that Mr. Stein may have believed that Netfire was associated with NCAA when he negotiated the transfer. However, Mr. Stein's deposition testimony is not clear enough to discern what he actually believed at the time or how he came to conclude that Netfire was associated with NCAA.[4] Netfire eventually pur-

---

3. Host Communications, NCAA's primary licensee, alleges that the parties had an "informal relationship" which allowed for "laxity" in their contracts, thus explaining why Host believed it had a license to use March Madness as early as the late 1980s, despite the absence of March Madness from the list of NCAA marks contained in the Host/NCAA contracts. (Plf.App.14.)

4. The Plaintiff argues that Mr. Stein's testimony reveals a fraudulent purchase by Netfire, in which Netfire intentionally misled Mr. Stein into thinking he was doing business with the NCAA. The deposition testimony is not clear enough for this court to draw a similar conclusion. However, as noted below in the discussion of the Defendants' cybersquatting claim, it would be reasonable for a

chased the domain from Mr. Stein in exchange for a $25,000 advertising credit for the marchmadness.com Website. The purchase was made on behalf of Inspark, the predecessor-in-interest to Defendant SMI. Inspark intended to develop a Website, accessible by the marchmadness.com domain name, that would cover the NCAA annual tournament.

In preparation for its business endeavor, Inspark obtained advertising contracts with GTE Entertainment, Sega, and other companies. Inspark also had discussions with Yahoo, Broadcast.com, and Host Communications regarding future relationships for the site. While developing the Website's design, Inspark instructed its web-designer to include sample disclaimers stating that the Website was not affiliated with the NCAA. Although it is not clear if such a disclaimer was ever accessible by the public, Inspark's marketing materials included a sample web page which reads, "MarchMadness.Com is not sanctioned by, sponsored by, or affiliated with the NCAA." (Plf.App.269.)

Approximately two weeks before the Seventh Circuit's opinion was issued in *Illinois High School Association v. GTE Vantage Inc.*, Inspark received a cease and desist letter in which IHSA demanded that Inspark transfer the marchmadness.com domain name to IHSA by October 25, 1996, or else IHSA would ask NSI to place the domain on hold.[5] Between October 1996 and February 1999, IHSA and Inspark, and then IHSA and SMI, corresponded on numerous occasions regarding Inspark/SMI's use of marchmadness.com. The correspondence consisted primarily of cease and desist letters from IHSA. The

letters contained threats of legal action and threats to ask NSI to place the domain on hold. SMI responded with its own threats of legal action based on the alleged interference that IHSA's actions were having with SMI's business plans. On December 18, 1998, IHSA formally requested that NSI place the marchmadness.com domain name on hold, and on June 21, 1999, NSI complied with the request.

At some point after the Seventh Circuit issued its decision in *Illinois High School Association v. GTE Vantage Inc.*, IHSA and NCAA entered into settlement talks. These talks resulted in the formation of March Madness Athletic Association, L.L.C., the remaining named Plaintiff in this case. MMAA consolidates all of IHSA's and NCAA's rights to March Madness. In turn, MMAA licenses March Madness in the following manner: it licenses the use of March Madness, in relation to the NCAA tournament, to NCAA; it licenses the use of March Madness, in relation to the IHSA tournament, to IHSA; and it retains the right to license the use of March Madness, in all other contexts, to third-parties. Revenues from the use of March Madness in relation to the NCAA tournament are given to NCAA; revenues relating to the IHSA tournament are given to IHSA, and revenues relating to anything other than the NCAA or IHSA basketball tournaments remain with MMAA. MMAA does not have its own employees; employees of NCAA and IHSA comprise the management team for the enterprise.

IHSA and NCAA signed the agreement creating MMAA on February 29, 2000, five

---

fact-finder to reach that conclusion based on the testimony.

**5.** NSI has a dispute resolution procedure by which it investigates allegations of trademark

violations by holders of domain names, and decides whether to place the domain on hold pending resolution of the trademark dispute.

days after this suit was filed. At that time, the only registered March Madness mark owned by IHSA or NCAA was United States Registration No. 1,571,340, for use in connection with the presentation of athletic and entertainment personalities in a panel forum. On February 6, 2001, MMAA successfully registered March Madness for the following uses: 1) "basketballs, basketball backboards and related accessories, namely, pumps, inflation needles and nets;" 2) "pre-recorded video cassettes featuring sporting events;" 3) "programs, folders, handbooks, magazines, and trading cards related to interscholastic activities;" 4) "cups and mugs;" 5) "towels and cloth banners;" and 6) "clothing, namely, shirts, sweatshirts, shorts, and hats." (Plf.App.325–27.) On May 3, 2001, MMAA was informed that its registration of March Madness has also been approved for, "entertainment in the nature of basketball tournaments between college teams." (Plf.App.317.)

The final aspect of the "madness" regarding March Madness concerns its increasing use by parties other than IHSA, NCAA, and MMAA. The summary judgment evidence reflects use of March Madness from 1998 to the present to describe phenomena and events including non-basketball sporting events hosted by scholastic and non-scholastic organizations, legislative activity, polka festivals, and sales or specials on cars, furniture, and electronic equipment. The parties submitted approximately forty examples of third-party use of March Madness; some of these uses incorporated basketball imagery, and some did not. However, the only third party uses that appear to reference the NCAA or IHSA basketball tournaments directly are those advertisements for sports bars where fans are invited to view the NCAA tournament on television.

IHSA, NCAA, and MMAA made some attempts to monitor and control third-party use of March Madness. There were at least three cease and desist letters to third parties included in the summary judgment evidence, and approximately eight responses to cease and desist letters, indicating that more than three cease and desist letters were actually sent. Some of the responses state that the third party agreed to stop using March Madness, some contained noncommittal statements that the allegedly wrongful use would stop because it was no longer March, and some contested NCAA, IHSA, or MMAA's right to prevent the party from using March Madness.

## Discussion

### I Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment only when the moving party demonstrates that there is no genuine issue as to any material fact and the party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Melton v. Teachers Ins. & Annuity Assoc. of Am.,* 114 F.3d 557, 559 (5th Cir.1997). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

Once the movant has discharged its initial burden under Rule 56, the nonmovant must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Topalian v. Ehrman,* 954 F.2d 1125, 1132 (5th Cir.1992), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121

L.Ed.2d 46 (1992). In weighing the evidence, the court must decide all reasonable doubts and inferences in the light most favorable to the nonmovant. *See Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 640 (5th Cir.1985). As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II Relevant Principles of Trademark Law

■ To prevail on a claim of trademark infringement, a plaintiff must prove that it has a protectable property right in the name it seeks to defend, and that the defendant's use of that name is likely to cause confusion. *See Security Ctr., Ltd. v. First Nat. Sec. Ctrs.,* 750 F.2d 1295, 1298 (5th Cir.1985) (citing, *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 786 (5th Cir.1984)). Both prongs of an infringement claim constitute questions of fact; indeed, the required inquiries have been described as "fact-intensive." *Society of Financial Examiners v. National Association of Certified Fraud Examiners, Inc.,* 41 F.3d 223, 224–25 (5th Cir. 1995); *see also Soweco Inc. v. Shell Oil Company,* 617 F.2d 1178, 1183 n. 12 (5th Cir.1980).

The motions before this court address only the first prong of the infringement inquiry; both parties ask this court to decide whether or not MMAA has a protectable property right in March Madness. To determine whether a protectable right exists, the mark must be grouped into one of four categories: arbitrary or fanciful; suggestive; descriptive; or generic. *See,*

*e.g., Soweco Inc.,* 617 F.2d at 1183. The attempt to classify a given term is a factual inquiry. *See id.* at n. 12 (citing, *Salton, Inc. v. Cornwall Corp.,* 477 F.Supp. 975 (D.N.J.1979)). In undertaking this attempt, it is important to recognize that "[t]hese categories are not discrete, however, but instead describe points on a spectrum ranging from strong to weak." *Credit Counseling Centers of America v. National Foundation for Consumer Credit, Inc.,* 1997 WL 160180, 2 (N.D.Tex.1997) (quoting, *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1433 (S.D.Ohio 1990)). In some cases, "[a] mark may fall within the hazy area between two categories." *Id.*

■ The greatest trademark protection is afforded to a term that is arbitrary or fanciful. *See Credit Counseling Centers,* 1997 WL 160180 *2 (citing, *Minturn Advertising v. Hermsen Design Assocs. Inc.,* 728 F.Supp. 430, 432 (N.D.Tex.1990) (citation omitted)). Arbitrary or fanciful terms bear no relationship to the product or service with which they are associated. *See Soweco Inc.,* 617 F.2d at 1184 ("Kodak" is an example of a word that has no relationship to the product it represents—cameras, film, photo processing, etc.).

■ A suggestive mark receives less protection than an arbitrary or fanciful mark. *See Credit Counseling Centers,* 1997 WL 160180 *2 (citing, *Minturn Advertising,* 728 F.Supp. at 432). "A 'suggestive' term 'suggests, rather than describes,' some characteristic of the goods to which it is applied and requires the consumer to exercise his imagination to reach a conclusion as to the nature of those goods." *Soweco Inc.,* 617 F.2d at 1184 (quoting, *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 115–16 (5th Cir.1979), cert. denied, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980))("Penguin" is an example of a word that would be sugges-

tive if used as a trademark for refrigerators.).

■ The next level of trademark protection is accorded to marks classified as descriptive. "A 'descriptive' term 'identifies a characteristic or quality of an article or service,' . . . as, for example, its color, odor, function, dimensions, or ingredients." *Soweco Inc.*, 617 F.2d at 1183 (quoting, *Vision Center*, 596 F.2d at 115; citing, *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3, 11 (5th Cir.1974)). Descriptive terms receive trademark protection only if they have acquired a secondary meaning to the consuming public. *Soweco Inc.*, 617 F.2d at 1183 (citing, *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474, 477 (5th Cir.1974)). A mark has a secondary meaning if it connotes "a *mental association* in buyers' minds between the alleged mark and a single source of the product." *P.A.W. Safety Charities v. Petco Animal Supplies, Inc.*, 2000 WL 284193, n. 5 (N.D.Tex.2000) (quoting, *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 (5th Cir.1984) (citation omitted, *emphasis in original*)). Examples of descriptive terms with sufficient secondary meanings include "Vision Center," when used in reference to a place where one purchases eyeglasses, and "Everready," when used in reference to batteries or light bulbs. *See Soweco Inc.*, 617 F.2d at 1183–84.

■■ A generic term, the last of the four types of marks, can never be trademarked, and a trademarked term that becomes generic over time can be cancelled, pursuant to the Lanham Act, 15 U.S.C. section 1064(3). *See id.* at 1183 (citations omitted). Some courts describe a generic term as referring to "a particular genus or class of which an individual article or service is but a member." *Id.* (citations omitted). The more common method of determining whether a term is generic is to ask "whether the public perceives the term primarily as the designation of the article." *Society of Financial Examiners*, 41 F.3d at 227 (quoting, *Blinded Veterans Assoc. v. Blinded American Veterans Foundation*, 872 F.2d 1035, 1041 (D.C.Cir.1989)). Conversely, "'the primary significance of' a [protectable] trademark 'in the minds of the consuming public is not the product but the producer.'" *Society of Financial Examiners*, 41 F.3d at 227 (quoting, *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73 (1938)); *see also* 15 U.S.C. § 1064(3) ("The primary significance of the registered mark to the relevant public . . . shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used."). Although a generic term cannot be trademarked, it is possible for a word to be generic of some things and not others; in such a case, the word may receive trademark protection for its non-generic use. *See Soweco Inc.*, 617 F.2d at 1183 ("ivory" is generic of elephant tusks but arbitrary as applied to soap) (citing, *American Heritage Life Insurance*, 494 F.2d at 9 n. 6).

■ A certificate of registration for a given mark constitutes *prima facie* evidence of the validity of the mark. *See B & S Underwriters, Inc. v. Clarendon National Insurance Company*, 892 F.Supp. 815, 820 (W.D.La.1995); 15 U.S.C. § 1057(b), 1115(a). However, this presumption is rebuttable and may be overcome by demonstrating, by a preponderance of the evidence, that the mark is generic, or if descriptive, that it lacks a secondary meaning. *See id.* (citing, *Vision Center*, 596 F.2d at 119); *Credit Counseling Centers*, 1997 WL 160180 *3 (citing, *Zatarains v. Oak Grove Smokehouse*, 698 F.2d 786, 793 (5th Cir.1983)); *Golf Warehouse, L.L.C., v. Golfer's Ware-*

*house, Inc.*, 142 F.Supp.2d 1307, 1309 (D.Kan.2001). Evidence used to overcome the presumption can include uncontested generic use by competitors, generic use by the plaintiff, dictionary definitions, media usage, testimony of persons in the trade, and consumer surveys. *See* McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed.).

## III MMAA's Rights in March Madness

### A Defendants' Motion for Summary Judgment

Defendants SMI and Netfire argue that they have adequately rebutted the presumption of protectability that arises from the fact that MMAA holds a number of registrations for March Madness. Specifically, the Defendants claim the evidence demonstrates that March Madness is generic for the culmination of the sport of basketball and that it may also be generic for any type of event that takes place in March. Using the genus/species language, the Defendants argue that March Madness describes a genus, the culmination of the sport of basketball, while the NCAA and IHSA tournaments are merely two different species of that genus.

### B Plaintiff's Response and Cross–Motion for Summary Judgment

MMAA argues in response that, "Defendants' arguments neither establish the requisite factual claim that the primary significance of MARCH MADNESS to basketball consumers is *any* basketball tournament, nor raise a genuine issue of material fact necessary to defeat MMAA's motion." (Plf. Resp & Cross–Mot. 13, *emphasis in original.*) MMAA's Cross-mo-

tion asks this court to rule that MMAA has a valid mark in March Madness for all of the goods and services covered by its registrations and use because March Madness is either arbitrary or suggestive when applied to MMAA's basketball-related products and services.

### C Analysis

 Because of the presumption arising from MMAA's registered trademarks, regardless of which party is technically the movant, the burden lies with the Defendants to demonstrate either that March Madness is generic as a matter of law, or that sufficient issues of material fact exist to rebut the Plaintiff's argument that March Madness is protectable as a matter of law. The Defendants have failed at the former, but succeeded at the latter.

As stated above, determining whether a protectable trademark exists is a fact-intensive inquiry. *See Society of Financial Examiners*, 41 F.3d at 224. The confidence with which both parties assert that the evidence overwhelmingly supports a finding that March Madness is generic, on the one hand, and a protected trademark on the other, emphasizes that this case presents a number of triable issues of fact, making summary judgment inappropriate. Moreover, the complexity of March Madness's evolution raises more factual issues than either party wishes to admit.

To begin, evidence exists to contradict the argument that March Madness is generic for the culmination of the sport of basketball.[6] Perhaps the strongest evidence comes from the Defendants themselves, in choosing marchmadness.com as

---

**6.** As this court will discuss below, it is not clear which source the Plaintiff wishes March Madness to be identified with. However, to defeat the Defendants' Motion for Summary Judgment, there need only be evidence that

there is *a* source identified with March Madness, thus raising a genuine issue of material fact as to whether or not March Madness is generic.

the domain name for a Website intended to feature the NCAA men's collegiate tournament. Dirk Brinkerhoff, one of Inspark/SMI's founders, testified that although he had a personal expectation that the Website would grow to include other NCAA tournaments, women's tournaments, NAIA and junior college tournaments, the official plan for the first year of marchmadness.com was to feature the NCAA men's collegiate tournament. Moreover, he testified that Inspark/SMI did not have a business plan specifying that the Website would move beyond the division one NCAA men's tournament to other aspects of college basketball at any time in the future.

In addition, Inspark/SMI perceived the connection between marchmadness.com and the NCAA to be so strong that it created clear disclaimers to include on the Website stating, "MarchMadness.Com is not sanctioned by, sponsored by, or affiliated with the NCAA." (Plf.App.269.) This demonstrates that Inspark/SMI believed that the "primary significance" of March Madness "in the minds of the consuming public" was not the generic product—the sport of basketball, but the specific producer—the NCAA. *Society of Financial Examiners*, 41 F.3d at 227.

Moreover, there is evidence that the media and the public identify March Madness with the NCAA. For example, the New York Times Crossword puzzle answer of "NCAA" for the clue "March Madness org" demonstrates that the New York Times assumed the public would know to associate March Madness with the NCAA. In addition, the Plaintiffs submitted approximately a dozen articles from this past March in which media outlets used March Madness in reference to the NCAA's college tournament, as well as similar articles from as far back as 1992.[7] Moreover, the NCAA, its licensees, and corporate sponsors use March Madness in reference to the NCAA tournament in advertising and promotional materials. It is reasonable to infer that these experienced and successful corporations would only use March Madness if they believed the public would make the association between March Madness and the NCAA tournament.

Finally, the depositions of both parties' experts raise genuine issues of material fact regarding the genericness of March Madness. For example, Gerald Keller, a business appraiser hired by the Defendants, stated in his deposition that he would associate March Madness with the NCAA tournament, and "that's what it has been associated with historically, primarily." (Plf.App.134.) In addition, Plaintiff's expert, George Mantis, opined in his sworn declaration that "the primary significance of March Madness is a trademark that identifies a specific basketball-related sports event sponsored by a single source." (Plf.App.43.) And, the survey conducted by Mr. Mantis demonstrated that 61 percent of eligible consumers recognized March Madness as a trade name, as opposed to a common name.[8]

---

**7.** This court takes notice of the fact that although the Plaintiff contested the admissibility of web page printouts by the Defendants, many of the articles submitted by the Plaintiff were printed off of media Websites. At this juncture in the proceedings, this court will accept such admissions from both parties.

**8.** This court is not opining on the weight that this survey, or Mr. Mantis's opinion, should receive. Unless a successful motion is made to exclude this evidence, Mr. Mantis's failure to ask for source identification in his survey, and any other potential weaknesses with the composition of the survey group and the methodology employed, will go to the weight the trier of fact will give to his opinion and the survey at trial. For now, this court finds only that Mr. Mantis's opinion and the survey results are sufficient to raise a genuine issue

Turning to the other side of the Defendants' burden, there is also sufficient evidence to raise genuine issues of material fact regarding whether March Madness is protectable as a matter of law for the goods and services covered by MMAA's registrations and use. Plaintiff claims that March Madness is arbitrary as applied to basketball tournaments, on-line services, and other items such as basketballs, pins, and apparel. According to the Plaintiff, March Madness "is a made-up phrase; there is no evidence of its existence prior to the IHSA's use. The phrase is a combination of two unrelated words, neither of which have definitions that imply basketball-related products or services." (Plf. Resp. Brief and Cross Mot. 23.) In the alternative, Plaintiff argues that the mark implies some characteristics of MMAA's basketball-related products or services, thus making the mark suggestive and entitled to protection.

There are two flaws in the Plaintiff's argument. First, even if March Madness was originally arbitrary or suggestive, and thus distinctive for MMAA's products and services, there is evidence to support the theory that over time, March Madness has become generic. Second, this court believes that March Madness is more akin to a descriptive mark than it is to an arbitrary or a suggestive mark. The term March Madness describes something mad; crazy, etc., that occurs in the month of March. Trademark protection would only be appropriate then, if the consuming public has come to attribute a secondary meaning to the phrase—i.e., the phenomena surrounding the NCAA and/or IHSA basketball tournaments each March. This is analogous to "Vision Center" being a descriptive phrase when used in reference to a place where one purchases eyeglasses, and "Everready" being descriptive when

used in reference to batteries or light bulbs. *See Soweco Inc.,* 617 F.2d at 1183–84.

Regardless of how March Madness is classified, this court must determine whether or not "reasonable minds could differ" as to whether the evidence demonstrates that the public associates March Madness with MMAA (if seeking a secondary meaning), or believes that MMAA is the primary producer of the products and services bearing the March Madness mark (if attempting to classify it as generic). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence presented on summary judgment demonstrates that reasonable minds could differ as to the strength of MMAA's association with March Madness.

First, there is evidence of generic use of March Madness by MMAA. This use is related to the fact that MMAA does not appear to know what it wants March Madness to signify in the minds of its consumers. Pursuant to the contractual agreement creating MMAA, March Madness can signify either the NCAA tournament, and related products and services, or the IHSA tournament, and related products and services. In addition, MMAA reserves the right to use MMAA in any context other than those related to the NCAA and IHSA. However, it is hard to imagine how MMAA could exercise this right without diluting the strength of the mark for NCAA and/or IHSA. MMAA attempts to explain this problem by arguing that its mark is so strong that it is simply expanding. However, there is absolutely no evidence that anyone identifies March Madness with MMAA; all associations are with either NCAA or IHSA. Therefore, any

and contribute to the defeat of SMI/Netfire's Motion.

expansion beyond those sources could render March Madness generic.[9]

In addition, members of MMAA's Board of Managers testified that March Madness transcends the NCAA and IHSA tournaments. For example, Melissa Caito answered "yes," when asked if she agrees with the statement that March Madness "means the seasonal culmination of the sport of basketball, including women's basketball, NAIA, NAIT, et cetera." (Caito Depo. 3–4.). In addition, David Fry testified that he believes "[March Madness] still has a breadth of meaning that people will utilize it for basketball at its culminating points beyond the collegiate tournament and the high school tournament." (Fry Depo. 6–7.) Moreover, the declarations submitted by the Plaintiff to "clarify" Ms. Caito's and Mr. Fry's testimony actually support the argument that MMAA intends to expand March Madness beyond the NCAA and IHSA tournaments. Other examples of generic use include the license of March Madness by IHSA to other high schools, and the broad use of March Madness by NCAA's corporate partners and licensees without attributing it to either NCAA or MMAA.

The Mantis survey, discussed above, also raises questions about the protectability of March Madness. Just as the 61 percent figure might convince a juror that March Madness is not generic, the same figure could lead a juror to believe that MMAA does not hold a protected mark in the phrase. This conclusion becomes more likely when comparing the 61 percent result for March Madness with the 92 and 93 percent results for the terms "Kentucky Derby" and "Stanley Cup." In addition, the fact that the survey did not ask which

brand the participants associated with March Madness could lead a fact-finder to discount its results.

Finally, the frequent use of March Madness for events and phenomena having nothing to do with basketball also raises a genuine issue of material fact as to whether MMAA has a protectable right to the phrase. The Defendants provided approximately forty examples of associations of March Madness with phenomena and events including non-basketball sporting events hosted by scholastic and non-scholastic organizations, legislative activity, polka festivals, and sales or specials on cars, furniture, and electronic equipment. Moreover, MMAA manager Melissa Caito testified that MMAA's official position is that such uses infringe on MMAA's rights in March Madness, again demonstrating the breadth of meaning that the Plaintiff itself attributes to this purportedly distinctive mark.

The evidence before this court fails to demonstrate, by a preponderance of the evidence, that March Madness is either generic, or descriptive but lacking a secondary meaning. *See e.g., B & S Underwriters, Inc.,* 892 F.Supp. at 820. However, the evidence also fails to demonstrate that MMAA has a valid mark in March Madness for all of the goods and services covered by its registrations and use. Therefore, the Defendants' Motion for Summary Judgment and the Plaintiff's Cross-motion for Partial Summary Judgment are **DENIED.**

## IV Motion for Summary Judgment on MMAA's Cybersquatting Claim

The Defendants also ask this court to dismiss Plaintiff's "Cybersquatting" claim,

---

**9.** This court recognizes that a similar opinion was rendered by Michael Elbein, counsel for the NCAA, in a 1995 letter to counsel for the IHSA. (Def.App.20–22.) However, the letter did not inform this court's opinion on this matter, and this court is not ruling on the admissibility of the letter at this time.

brought pursuant to 15 U.S.C. section 1125(d) (the Cyberpiracy provision). The Defendants argue that they have negated the Cyberpiracy provision's requirement of bad faith by presenting uncontradicted evidence that they had "reasonable grounds to believe that the use of [marchmadness.com] was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

The Cyberpiracy provision states as follows:

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person: (i) has a bad faith intent to profit from [a] mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or] (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark. . . .

15 U.S.C. § 1125(d). The provision lists a number of factors for a court to consider in discerning whether or not the person had a bad faith intent to profit, however the provision specifies that bad faith, "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

█ There is sufficient evidence to raise a genuine issue regarding the existence of bad faith. First, the Defendants' argument in support of their motion rests, in large part, on their claim that March Madness is generic. However, the holding above moots this aspect of the Defendants' argument. Second, it is clear that SMI was aware of the opinions in *Illinois High School Association v. GTE Vantage Inc.* when it developed the marchmadness.com Website. Although the courts did not hold that the NCAA had a protectable right in March Madness, the language of the opinions, as described above, is sufficient to raise a question about how reasonable it was for SMI to believe that its continued use of marchmadness.com was fair or lawful.

█ The Defendants are incorrect in arguing that they should only be held accountable for the information that was available to SMI at the time it registered marchmadness.com—before the opinions were issued in *Illinois High School Association v. GTE Vantage Inc.* First, they supply no case law to support this assertion. Second, the plain language of the Cyberpiracy provision does not support the Defendants' interpretation. Specifically, the "time of registration" language in the provision refers to the point at which the mark had to have been distinctive or famous. It does not refer to the point at which the alleged cyberpirate had to have known the mark was distinctive or famous. Moreover, the provision clearly encompasses bad faith use of a previously registered domain, in addition to bad faith registration. Therefore, the provision should be interpreted to mean that a person acts in bad faith when using a domain that is identical, confusingly similar to, or dilutive of a mark that was distinctive or famous at the time it was registered, regardless of what the person knew at the time of registration.

This court's decision does not rely on this interpretation however, as there exists other evidence to support an argument that the Defendants had a bad faith intent to profit from their use of marchmad-

ness.com. For example, SMI chose to include clear disclaimers on the Website, explaining that it was not affiliated with the NCAA. This choice evidences SMI's knowledge that consumers might confuse their Website with a product produced by the NCAA. Other relevant evidence is the insinuation by Adam Stein that the Netfire representative who approached him to purchase marchmadness.com on SMI/Inspark's behalf claimed to be working with the NCAA.

Considering the evidence in the light most favorable to the nonmovant, *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988); *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640 (5th Cir.1985), and acknowledging that the issue of intent is not well-suited for summary judgment, *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir.1991), this court holds that a genuine issue of material fact exists as to the Defendants' bad faith in registering and using marchmadness.com. Therefore, the Motion for Summary Judgment on the Cybersquatting claim is hereby **DENIED.**

**V IHSA's Motion for Summary Judgment on SMI's Counterclaim for Conversion**

In their Second Amended Answer and Counterclaim, the Defendants added a claim of conversion against Third-party Defendant, IHSA. The conversion claim is premised on the theory that IHSA wrongfully exercised dominion and control over SMI's property when it asked Network Solutions, Inc. (NSI) to place the marchmadness.com domain name on hold. "Texas law defines conversion as '[t]he wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights.'" *Permian Petroleum Company v. Petroleos Mexicanos*, 934 F.2d 635, 651 (5th Cir.1991) (quot-

ing, *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446 (Tex.1971)).

There is no evidence before this court to support the theory that IHSA exercised dominion and control over the marchmadness.com domain name. As explained above, IHSA asked NSI to engage in a preestablished, internal procedure by which NSI exercises its discretion in determining whether or not to place a domain name on hold. NSI exercised its discretion and decided to place marchmadness.com on hold, where it remains today. This court's understanding is that NSI, and to some extent, SMI, currently controls marchmadness.com. The Defendants have submitted nothing which might possibly lead to the conclusion that IHSA has any amount of dominion or control over SMI's property. Therefore, IHSA's Motion for Summary Judgment on SMI's counterclaim for conversion is hereby **GRANTED.**

### *Conclusion*

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **DENIED,** the Plaintiff's Cross–Motion for Partial Summary Judgment is **DENIED,** and the Third-party Defendant's Motion is **GRANTED.** SMI's counterclaim for conversion is hereby **DISMISSED WITH PREJUDICE.**

It is so **ORDERED.**